**CVD, INCORPORATED, et al.,**
**Plaintiffs, Appellees,**

v.

**RAYTHEON COMPANY, Defendant**
**and Third-Party Plaintiff,**
**Appellant.**

**No. 84–1652.**

United States Court of Appeals,
First Circuit.

Argued March 6, 1985.

Decided July 30, 1985.

As Amended on Denial of Rehearing
and Rehearing En Banc
Sept. 23, 1985.

Jack Brown, Phoenix, Ariz., with whom Lawrence G.D. Scarborough, Bonnie P. Tucker, Victoria S. Lewis, Brown & Bain, P.A., Phoenix, Ariz., Philip M. Cronin, Roger D. Matthews, Devra G. Bailin, Withington, Cross, Park & Groden, Boston, Mass., and Charles H. Resnick, Lexington, Mass., were on brief for appellant.

Blair L. Perry, Boston, Mass., with whom Hale & Dorr, Boston, Mass., was on brief for appellees.

Before COFFIN and TORRUELLA, Circuit Judges, and RE,* Judge.

RE, Chief Judge:

In this action, brought under the antitrust laws of the United States, defendant Raytheon Company (Raytheon) appeals from a judgment, entered pursuant to a special jury verdict, in the District Court for the District of Massachusetts. The judgment awarded plaintiff CVD, Inc. ("CVD") treble damages of $3,180, plus attorneys' fees and costs, granted plaintiffs declaratory relief, and dismissed the defendant's counterclaims.

The dispute between plaintiffs, CVD, Inc., Robert Donadio and Joseph Connolly, both former Raytheon employees, and defendant Raytheon pertains to the manufacture of zinc selenide (ZnSe) and zinc sulfide (ZnS) by a process known as chemical vapor deposition (cvd). On August 28, 1981, plaintiffs Donadio, Connolly, and CVD initiated this action, contending that defendant Raytheon attempted to monopolize the market for ZnSe and ZnS made by the cvd process, in violation of 15 U.S.C. § 2 (1982), and that a licensing agreement between the plaintiffs and Raytheon was an unreasonable restraint of interstate commerce and trade in violation of 15 U.S.C. § 1 (1982). The complaint sought damages and a declaratory judgment that the agreement between Raytheon and CVD, purporting to license the cvd process, was void and unenforceable. The defendant counterclaimed for breach of contract, misappropriation of trade secrets, breach of fiduciary duty, and violation of the Massachusetts consumer protection statute.

After a 27 day trial, in response to special interrogatories formulated by the court, the jury returned a verdict for the plaintiffs. Raytheon, who had previously moved for a directed verdict, filed motions for judgment notwithstanding the verdict, and for a new trial. These motions were denied, and judgment was entered for the plaintiffs. Defendant Raytheon thereupon filed a timely notice of appeal.

Raytheon asks this Court to order that, notwithstanding the verdict, judgment be entered for Raytheon on the ground that there was insufficient evidence to support the verdict of the jury. In the alternative, Raytheon urges that the verdict should be set aside, since, in its view, it is against the weight of the evidence. Raytheon also contends that the jury's finding of damages on the plaintiffs' antitrust claim should be set aside because the plaintiffs suffered no antitrust injury. In addition, Raytheon raises several subsidiary arguments that will be discussed in this opinion.

Since we find that the jury verdict was supported by sufficient evidence, and that Raytheon's contentions and other assertions of error are without merit, the judgment of the district court is affirmed.

*Facts*

Raytheon, a Delaware corporation with executive offices in Massachusetts, is a diversified company specializing in commercial and military electronics, materials and weapons. In 1959, plaintiff-appellee Donadio was hired as an engineer in the Advanced Materials Department at Raytheon. He was employed there until he resigned in the fall of 1979 in order to form CVD. Plaintiff-appellee Connolly was hired by Raytheon in 1972, and was employed there continuously until he also left to form CVD. Donadio and Connally had signed employment agreements promising to protect Raytheon's proprietary information. Both were involved in the manufacture of zinc selenide and zinc sulfide by chemical vapor deposition (ZnSe/cvd or ZnS/cvd). This process combines vaporized zinc solids with hydrogen sulfide or hydrogen selenide in specially modified, high-temperature (ap-

* The Honorable Edward D. Re, Chief Judge, United States Court of International Trade, sitting by designation.

proximately 900° centigrade) vacuum furnaces. The resulting solid materials are further processed into high precision optical materials which are used to make, among other things, infrared windows for lasers, high-speed aircraft, and missiles. These materials are the only suitable materials for certain demanding optical uses. Most of Raytheon's work on these materials had been done under contracts with the federal government. As part of its obligation under these contracts, Raytheon was required to provide periodic reports that detailed the technology and processes used in the production operation.

In the fall of 1979, Donadio informed his supervisor, Dr. James Pappis, the manager of the Advanced Materials Department, that he intended to leave Raytheon to start a new company to manufacture ZnS and ZnSe by the cvd process. Pappis replied that this would present legal difficulties in light of Donadio's employment agreement and Raytheon's trade secrets. The next day Pappis consulted with Leo Reynolds, a patent attorney with Raytheon, who spoke with Pappis briefly, and examined some drawings and the government reports for the purpose of determining whether the cvd process contained trade secrets.

The following day Donadio and Connolly met with Pappis, Reynolds, Joseph Pannone, the Patent Counsel for Raytheon, and another Raytheon executive. Reynolds told Donadio and Connolly that they could not manufacture ZnS and ZnSe by the cvd process without using Raytheon trade secrets. Although Donadio disputed Reynolds' assertion that trade secrets were involved, Reynolds threatened to sue if they began to manufacture ZnS/cvd or ZnSe/cvd without a license from Raytheon. Soon thereafter, Donadio and Connolly were asked to leave Raytheon.

After this meeting, Donadio retained an attorney, Jerry Cohen, who specialized in intellectual property. In discussions with Raytheon, Cohen took the position that there were no trade secrets in Raytheon's chemical vapor deposition process since the technology had been published in government reports, and, therefore, was in the public domain. Raytheon asserted, and later attempted to prove at trial, that important details were not included in the reports, and that, consequently, the reports were too vague to permit anyone to reproduce the cvd system. Cohen asked Reynolds for a list of what Raytheon claimed to be trade secrets. Reynolds refused to comply with the request on the ground he could not provide an "all-inclusive" list. At a later meeting, Reynolds read orally a list of claimed secrets but Cohen disputed all the items on the list.

In attempting to settle the dispute, Cohen proposed an agreement in which CVD would not be obligated to pay royalties if CVD could prove that no Raytheon trade secrets were used in its operations. This proposal was refused. Several other formulas for resolving the dispute were also discussed. Raytheon, however, held firm to its position that the plaintiffs could not manufacture ZnS/cvd or ZnSe/cvd without using Raytheon trade secrets, and insisted on a royalty rate based upon a flat percentage of revenue or volume for a ten-year period. Eventually, on February 15, 1980, an agreement was signed, providing for a 15% royalty on earnings for ZnSe and 8% for ZnS. No payments were ever made by CVD under the contract, however, and in 1981 plaintiffs filed the present action.

*Standard of Review*

■ The standard of review in setting aside a jury verdict is quite narrow. In order to set aside a verdict, and grant a new trial, the trial judge must find that "the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a clear miscarriage of justice." *Coffran v. Hitchcock Clinic, Inc.,* 683 F.2d 5, 6 (1st Cir.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982); *Borras v. Sea-Land Service, Inc.,* 586 F.2d 881, 886–87 (1st Cir.1978). A jury verdict that is supported by the evidence may not be set aside simply because the trial judge or the appellate court would have reached a different re-

sult. *See, e.g., Coffran, supra,* 683 F.2d at 6; *Borras, supra,* 586 F.2d at 887.

In this case, there is evidence which contradicts the plaintiffs' position. Nevertheless, the jury was not required to believe the defendant's evidence. *See Ford Motor Co. v. Webster's Auto Sales, Inc.,* 361 F.2d 874, 885 (1st Cir.1966). When conflicting evidence is presented, from which contradictory inferences may be drawn, it is the role of the jury to make the ultimate determinations of fact. *See, e.g., Engine Specialties, Inc. v. Bombardier Ltd.,* 605 F.2d 1, 9 (1st Cir.1979), *cert. denied,* 446 U.S. 983, 100 S.Ct. 2964, 64 L.Ed.2d 839 (1980).

After having heard 25 days of evidence presented at trial, the trial judge found sufficient evidence to support the verdict of the jury. It is basic that the appellate court will overturn the trial court's decision only if there has been an abuse of discretion. *Coffran, supra,* 683 F.2d at 6.

The standard for granting a judgment *non obstante veredicto* (n.o.v.) is even more burdensome and narrow. A motion for judgment n.o.v. " 'is properly granted only when, as a matter of law, no conclusion but one can be drawn.' " *United States v. Articles of Drug Consisting of the Following,* 745 F.2d 105, 113 (1st Cir. 1984), *cert. denied sub nom.* —— U.S. ——, 105 S.Ct. 1358, 84 L.Ed.2d 379 (1985) (quoting, *Rios v. Empresas Lineas Maritimas Argentinas,* 575 F.2d 986, 990 (1st Cir. 1978) ). The question presented, therefore, is whether, after reviewing the evidence in the light most favorable to the plaintiffs, and drawing all reasonable inferences in their favor, there is sufficient evidence in the record to support the verdict. *Engine Specialties, Inc., supra,* 605 F.2d at 9; *Rios, supra,* 575 F.2d at 990. Since we find that there is sufficient evidence in the record to support the jury's verdict, we affirm the judgment of the district court.

### Sherman Act

This case presents a difficult question pertaining to the interaction of the federal antitrust laws and state trade secrets law. Guidance in resolving these questions can be found in analogous, but not identical, issues presented in cases in which patent infringement suits have been brought in bad faith with an intent to restrain competition or monopolize. *See, e.g., Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Handgards, Inc. v. Ethicon, Inc.,* 743 F.2d 1282 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985) (*Handgards II* ); *Kearney & Trecker Corp. v. Cincinnati Milacron Inc.,* 562 F.2d 365 (6th Cir.1977); *Rex Chainbelt, Inc. v. Harco Products, Inc.,* 512 F.2d 993 (9th Cir.), *cert. denied,* 423 U.S. 831, 96 S.Ct. 52, 46 L.Ed.2d 49 (1975).

In examining "bad faith" patent infringement claims, courts have balanced the public interest in free competition, as manifested in the antitrust laws, with the federal interest in the enforcement of the patent laws, and the first amendment interest in the free access to courts. *See, e.g., Walker Process, supra,* 382 U.S. at 177–78, 86 S.Ct. at 350–351; *Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986, 993–96 (9th Cir.1979), *cert. denied,* 444 U.S. 1025, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980) (*Handgards I* ); *Kobe, Inc. v. Dempsey Pump Co.,* 198 F.2d 416, 424–25 (10th Cir.), *cert. denied,* 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651 (1952). In the *Walker Process* case, the Supreme Court held that the enforcement of a patent obtained by fraud may constitute monopolization or attempted monopolization in violation of section 2 of the Sherman Act, provided the other elements of a monopolization claim are established. 382 U.S. at 177–78, 86 S.Ct. at 350–351. In evaluating actions brought under this theory, courts have protected the federal interests in patent law enforcement and the free access to the courts by requiring, in addition to the other necessary elements of an antitrust claim, "clear and convincing evidence" of fraud in asserting or pursuing patent infringement claims. *See, e.g., Handgards I, supra,* 601 F.2d at 996; *Norton Co. v. Carborundum Co.,* 530 F.2d 435, 444 (1st Cir.1976); *Cataphote Corp. v. DeSoto*

*Chemical Coatings, Inc.*, 450 F.2d 769, 772 (9th Cir.1971), *cert. denied*, 408 U.S. 929, 92 S.Ct. 2497, 33 L.Ed.2d 341 (1972).

■ Hence, a patentee who has a good faith belief in the validity of a patent will not be exposed to antitrust damages even if the patent proves to be invalid, or the infringement action unsuccessful. The requirement of clear and convincing evidence is intended to prevent a frustration of the patent laws. It also ensures the free access to the courts by allowing honest patentees to protect their patents without undue risk of incurring liability for asserting their rights.

■ There are, of course, significant differences between patent and trade secret protection. The scope of protectible trade secrets is far broader than the scope of patentable technology. *See, e.g., Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 486, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974); *Atlantic Wool Combing Co. v. Norfolk Mills, Inc.*, 357 F.2d 866, 869 (1st Cir.1966). Under Massachusetts law, a trade secret may consist of:

> any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be ... a process of manufacturing.... A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article.

*Eastern Marble Products Corp. v. Roman Marble, Inc.*, 372 Mass. 835, 364 N.E.2d 799, 801 (1977), *quoting*, Restatement of Torts § 757 comment b; *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736, 260 N.E.2d 723, 729 (1970).

The basis for the federal patent system is found expressly in the Constitution. *See* U.S. Const. art. I, § 8, cl. 8. A patent confers a legal monopoly for a limited period of time. In return for the patent, the patentee must fully disclose the patented invention or process. After the expiration of the statutory period, the patentee loses all exclusive rights to the patent. *See, e.g., Kewanee Oil Co., supra*, 416 U.S. at 480–81, 94 S.Ct. at 1885–1886.

■ The cornerstone of a trade secret, however, is secrecy. Once a trade secret enters the public domain, the possessor's exclusive rights to the secret are lost. Moreover, unlike a patent, a trade secret affords no rights against the independent development of the same technology or knowledge by others. *See, e.g., Kewanee Oil Co., supra*, 416 U.S. at 475–76, 94 S.Ct. at 1883–1884; *A. & E. Plastik Pak Co. v. Monsanto Co.*, 396 F.2d 710, 714–15 (9th Cir.1968).

■ As with patent law, the rationale behind state trade secret law is to encourage invention, and to provide innovators with protection for the fruits of their labors. *See, e.g., Kewanee Oil Corp., supra*, 416 U.S. at 481–85, 94 S.Ct. at 1886–1888. In addition, trade secret law is intended to maintain and promote standards of commercial ethics and fair dealing. *Id.*

■ In this case, the court must resolve a dispute which brings into focus the tension between the antitrust laws and the public interest in the licensing of trade secrets. Generally, there is a significant public interest in the licensing of trade secrets. By licensing a trade secret, the licensor partially releases his monopoly position and effectively disseminates information. *See Kewanee Oil Co., supra*, 416 U.S. at 486, 94 S.Ct. at 1888; *A. & E. Plastik Pak, supra*, 396 F.2d at 715. The result, it is hoped, is greater competition that will enure to the benefit of the public.

■ Like the holders of other intellectual property rights, possessors of trade secrets are entitled to assert their rights against would-be infringers and to defend their rights in court. *See Handgards I, supra*, 601 F.2d at 993 (*citing Eastern Railroad Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85

S.Ct. 1585, 14 L.Ed.2d 626 (1965) ). Nevertheless, the assertion in bad faith of trade secret claims, that is, with the knowledge that no trade secrets exist, for the purpose of restraining competition does not further the policies of either the antitrust or the trade secrets laws. *Cf. Handgards I, supra,* 601 F.2d at 993; P. Areeda & D. Turner, 3 Antitrust Law, § 708. Thus, it seems clear that the assertion of a trade secret claim in bad faith, in an attempt to monopolize, can be a violation of the antitrust laws. *See A. & E. Plastik Pak Co., supra,* 396 F.2d at 715. Similarly, it is well established that an agreement which purports to license trade secrets, but in reality, is no more than a sham, or device designed to restrict competition, may violate the antitrust laws. *A. & E. Plastik Pak Co., supra,* 396 F.2d at 715. *Cf. United States v. Imperial Chemical Industries,* 100 F.Supp. 504, 592 (S.D.N.Y.1951).

We believe that the proper balance between the antitrust laws and trade secrets law is achieved by requiring an antitrust plaintiff to prove, in addition to the other elements of an antitrust violation, by clear and convincing evidence, that the defendant asserted trade secrets with the knowledge that no trade secrets existed. In order to prove a contract or combination in restraint of trade in violation of section 1 of the Sherman Act, the plaintiff must also prove that the defendant had market power in the relevant market, and the specific intent to restrain competition. To succeed in an attempted monopolization claim under section 2 of the Sherman Act, the plaintiff must prove that the defendant had the specific intent to monopolize the relevant market, and a dangerous probability of success. As other courts have noted, a specific intent to monopolize or restrain competition can often be inferred from a finding of bad faith. *Handgards II, supra,* 743 F.2d at 1293 (quoting *Handgards I, supra,* 601 F.2d at 993 n. 13).

This case differs from the *Walker Process* line of cases in that Raytheon did not actually initiate litigation against the plaintiffs. Instead, the evidence indicates that it used the threat of litigation to exact a licensing agreement from the plaintiffs. In this case, litigation with Raytheon would have proved ruinous to the newly formed corporation, and effectively foreclosed competition in the relevant market. Under these circumstances, we hold that the threat of unfounded trade secrets litigation in bad faith is sufficient to constitute a cause of action under the antitrust laws, provided that the other essential elements of a violation are proven.

### Relevant Market

It is undisputed that, until CVD's formation, Raytheon was the only company in the world to produce for commercial sale zinc selenide or zinc sulfide by chemical vapor deposition. One other company, II–VI, Inc., produced small quantities of zinc selenide for its own use. Because of their low porosity and high purity, ZnSe and ZnS made by the chemical vapor deposition process are the only suitable materials for certain demanding optical uses. Specifically, because of its optical properties and its durability, zinc sulfide cvd is the only suitable material for use in 8–12 micron "forward looking infrared" windows on missiles and jet aircraft. Zinc selenide is the only suitable material for windows in high energy carbon dioxide lasers.

In answer to a special interrogatory, the jury found that the defendant Raytheon had market power as to both zinc sulfide and zinc selenide. This conclusion is amply supported by the evidence.

### Trade Secrets and Bad Faith

The proof as to the existence of trade secrets and the defendant's bad faith in asserting them, if they did not exist, is necessarily intertwined. As noted, in order to be protected by law, a trade secret must be kept in secret. *See U.S.M. Corp. v. Marson Fastener Corp.,* 379 Mass. 90, 98–99, 393 N.E.2d 895, 899 (1979); *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.,* 357 Mass. 728, 737, 260 N.E.2d 723, 730 (1970). Heroic measures to ensure secrecy are not essential, but reasonable pre-

cautions must be taken to protect the information. *See U.S.M. Corp., supra,* 397 Mass. at 97–98, 393 N.E.2d at 900. Whether a trade secret exists depends in each case "on the conduct of the parties and the nature of the information." *Eastern Marble Products Corp. v. Roman Marble, Inc.,* 372 Mass. 835, 364 N.E.2d 799, 802 (1977); *Jet Spray Cooler, Inc. v. Crampton,* 361 Mass. 835, 840, 282 N.E.2d 921, 925 (1972). Although the fact that a product is unique tends to prove that a trade secret exists, *see Curtiss-Wright Corp. v. Edel-Brown Tool & Die Co.,* 381 Mass. 1, 11, 407 N.E.2d 319, 326 (1980), "[u]niqueness without more is not commensurate with possession of a trade secret." *Dynamics Research Corp. v. Analytic Sciences Corp.,* 9 Mass.App. 254, 400 N.E.2d 1274, 1286 (1980); *Laughlin Filter Corp. v. Bird Machine Co.,* 319 Mass. 287, 290, 65 N.E.2d 545, 546–47 (1946).

▆ It is also "well settled that an employee upon terminating his employment may carry away and use the general skill or knowledge acquired during the course of the employment." *Junker v. Plummer,* 320 Mass. 76, 79, 67 N.E.2d 667, 669 (1946). *See Jet Spray Cooler, Inc. v. Crampton,* 361 Mass. 835, 839, 282 N.E.2d 921, 924 (1972); *Dynamics Research Corp. v. Analytic Sciences Corp.,* 9 Mass.App. 254, 400 N.E.2d 1274, 1282 (1980); *see generally,* 2 J. McCarthy, Trademarks and Unfair Competition § 29:16 (1973). This principle effectuates the public interest in labor mobility, promotes the employee's freedom to practice a profession, and freedom of competition. *See Club Aluminum Co. v. Young,* 263 Mass. 223, 225–27, 160 N.E. 804, 805–06 (1928); *Dynamics Research Corp. v. Analytic Sciences Corp.,* 9 Mass. App. 254, 400 N.E.2d 1274, 1282 (1980).

▆ The existence of trade secrets in Raytheon's ZnS/cvd and ZnSe/cvd manufacturing process depends upon the degree of public disclosure of the relevant information. It is the determination of this Court that the jury could have found sufficient evidence that the essential information contained in the cvd technology had entered the public domain, and, therefore, Raytheon possessed no trade secrets in this technology. Furthermore, there was sufficient evidence for the jury to find that Raytheon knew that no trade secrets existed. Hence, it was proper for the jury to conclude that Raytheon's assertion of trade secrets and exaction of the licensing agreement were in bad faith.

Specifically, upon the evidence presented, the jury could have found the following facts to support its conclusions. The process of chemical vapor deposition generally was well known in the scientific community. Raytheon regularly published schematics, diagrams, run conditions, and other detailed information related to the production of ZnS/cvd and ZnSe/cvd in periodic reports supplied to the government as part of Raytheon's contractual obligations. Although some of the reports were temporarily classified by the government for security purposes, all of these reports were available to the public by 1979. At trial, the plaintiffs demonstrated that nearly all the details originally claimed as trade secrets were published in the reports. There was also evidence that the details not specifically mentioned in the reports were either obvious or insignificant, or both.

In addition, Raytheon employees had published papers relating to cvd technology in scientific journals. Raytheon had also produced a film about this technology which was shown to a convention of engineers (and later to the jury). Photographs of the interior of the cvd furnace were published in various publications. Raytheon employees gave lectures and speeches on the technology to various groups, often accompanied by viewgraphs or slides of the equipment. Although access to the facility was limited, visitors were permitted to view the furnaces. Donadio testified that, based on the information disclosed to the public, a competent engineer could construct and operate a viable system for the production of zinc selenide or zinc sulfide through chemical vapor deposition. It is also noteworthy that the furnaces built by CVD were smaller than

Raytheon's latest furnaces and differed in certain dimensions.

Notwithstanding the extent of this public disclosure, Raytheon argues that the information in the public domain was too vague and incomplete to enable anyone to reproduce the system without costly trial and error experimentation. Defendant presented expert testimony in support of this view. Nevertheless, the jury was not required to believe the defendant's evidence. *See Ford Motor Co. v. Webster's Auto Sales, Inc.,* 361 F.2d 874, 885 (1st Cir.1966). Although Donadio's testimony was consistent with his self-interest, it was nevertheless based upon his personal knowledge and expert opinion founded on over 20 years of experience in chemical vapor deposition. Moreover, on cross-examination, the defendant's experts admitted that many of the details claimed to be trade secrets would occur as logical, if not obvious, choices to a competent engineer designing a system. Under these circumstances, it is not for this Court to judge the credibility of witnesses. The jury, therefore, was entitled to, and apparently did, rely upon and give credence to the plaintiffs' evidence over that of the defendant.

Also significant, as to both the existence of trade secrets and the issue of bad faith, was Raytheon's failure to follow its own established procedures for the protection of trade secrets. For example, despite a written policy that all confidential drawings and documents were to be stamped with a restrictive legend warning of the document's confidential nature, none of the engineering drawings for the cvd furnaces was stamped or marked with any restrictive legend. Furthermore, there was no evidence that Donadio or Connolly took any engineering drawings with them when they left Raytheon. Indeed, there was evidence, albeit inconclusive, tending to suggest that Raytheon had altered drawings after the commencement of this litigation to conform to CVD drawings.

There was also sufficient evidence for the jury to conclude that Raytheon had made a policy decision not to protect at least certain aspects of the cvd process. For example, Raytheon's patent department instructed Raytheon's engineering personnel that an "invention disclosure should be submitted on every new or improved device, system, method or composition of matter ... which is more than routine engineering." These forms were reviewed by a committee and a determination was made as to how they should be protected. The disclosures were then assigned a status code reflecting the committee's determination. Code 3 meant that the item should be protected as a trade secret. Code 2 indicated that a patent application would not be filed, and that the item was not to be protected as a trade secret. Items that were designated for protection as trade secrets were filed in a file section referred to as the "trade secrets drawer."

Evidence introduced at trial indicated that no invention disclosures relating to the manufacture of zinc selenide or zinc sulfide by the cvd process were ever designated for protection as a trade secret. Moreover, nothing related to ZnS/cvd or ZnSe/cvd was found in the "trade secrets drawer." It appears that the only invention disclosure relating to ZnSe/cvd was filed in 1973, prior to the development of Raytheon's more advanced furnaces. This disclosure was classified status code 2, *i.e.,* "Do not protect."

Raytheon introduced evidence tending to minimize the significance of these facts. Nevertheless, the jury could properly and fairly have drawn the inference that, since Raytheon did not follow its formalized procedures in protecting ZnS/cvd and ZnSe/cvd technology, it did not have the intention to maintain the technology as a trade secret.

Other evidence that would tend to prove bad faith includes the fact that Reynolds asserted trade secrets, and threatened litigation, after only a cursory investigation without thoroughly examining the majority of the government reports or the extent of public disclosure. Reynolds also refused to give Cohen a list of claimed secrets. From this, the jury could have inferred that

Reynolds could not make such a list because he knew that there were no secrets. There was also testimony that Cohen pointed out to Reynolds that all the items Reynolds claimed were trade secrets at their January 22, 1980 meeting were in fact published in the government reports.

 In short, the record reveals the extensive public disclosure, Raytheon's failure to follow its own procedures for trade secret protection, its refusal to specify trade secrets in asserting its claims or in the agreement, and its insistence on a flat ten-year term at 15% and 8% royalty rates. In light of these facts, the jury could have concluded that Raytheon knew it had no trade secrets, yet nevertheless asserted them in bad faith in order to restrain competition and monopolize the ZnS/cvd and ZnSe/cvd markets.

### Hot Isostatic Pressing

 Raytheon included in its counterclaim a cause of action for misappropriation of trade secrets related to the processing of zinc sulfide by hot isostatic pressing (hipping). Hot isostatic pressing involves subjecting a material to extremely high pressures of up to 30,000 pounds per square inch at a high temperature. Under the proper conditions, the process will improve the transparency of zinc sulfide, thereby enhancing its optical quality.

Raytheon alleges that CVD induced its hipping contractor, Industrial Materials Technology, Inc. (IMT), to reveal Raytheon's trade secrets in hipping, specifically its run conditions and its use of platinum foil to wrap the zinc sulfide. In response to a special interrogatory, the jury found that Raytheon had no trade secrets in the hipping process. Raytheon contends that it established this claim as a matter of law, and that it is therefore entitled to judgment n.o.v. or a new trial on this claim. The defendant also requested that the district court make findings pursuant to Rule 49(a) of the Federal Rules of Civil Procedure, and grant injunctive relief, which the district court refused.

Dr. Charles Willingham, a Raytheon employee, testified that Raytheon's use of platinum foil was unique and confidential. Raytheon also introduced evidence that IMT had made a common hipping run of Raytheon and CVD materials.

Donadio, however, testified that he had never requested either a common run with Raytheon or that IMT reveal Raytheon run conditions. He also testified that, basically, he relied on Dr. Peter Price, the president of IMT, who was a leading expert on hipping, to determine run conditions. The plaintiffs also presented evidence that, by 1979, hipping to improve transparency was well known in the scientific community.

Although Donadio and Connolly were aware that zinc sulfide was being hipped by Raytheon, they were never informed of specific run conditions while at Raytheon. The pressure and temperature levels of the hipping run were determined by IMT's capacity and zinc sulfide's chemical properties, respectively. The use of platinum foil, Donadio testified, was Dr. Price's suggestion. Melvin Mittnick, a former IMT employee, testified that IMT had used platinum foil wrap in hipping other types of materials.

In regard to the hipping issue, we also find that there was sufficient evidence to support the jury verdict. In response to the defendant's Rule 49(a) motion, the district judge found that the jury determination that Raytheon had no trade secrets in the hipping process precluded him from making further findings of fact or granting Raytheon any relief on this issue. Although he noted that he would have found that the use of platinum foil constituted a trade secret of Raytheon, he properly deferred to the jury's assessment of the evidence.

### Reliance

 Defendant Raytheon argues strenuously that reliance is a necessary element to establish a cause of action against it. Since the plaintiffs did not rely on any of Raytheon's misstatements, and entered into the agreement while represented by

competent counsel, Raytheon contends that plaintiffs are precluded from relief. In an action to rescind the contract or recover damages on a theory of fraud, under Massachusetts law, this contention might have merit. *See Metropolitan Life Ins. Co. v. Ditmore,* 729 F.2d 1, 4 (1st Cir.1984); *Liberty Leather Corp. v. Callum,* 653 F.2d 694, 699 (1st Cir.1981); *Brockton Savings Bank v. Peat, Marwick, Mitchell & Co.,* 577 F.Supp. 1281, 1287 (D.Mass.1983). Nevertheless, it is clear that the policies expressed in the federal antitrust laws will override any agreement in contravention of those policies, regardless of the agreement's legality under private contract law. *See Simpson v. Union Oil Co.,* 377 U.S. 13, 18, 84 S.Ct. 1051, 1055, 12 L.Ed.2d 98 (1964); *Wegmann v. London,* 648 F.2d 1072, 1074 (5th Cir.1981); *Cf. Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969).

It is also well established that the federal interest in the "full and free use of ideas in the public domain" will override state law in conflict with it. *Lear, Inc. v. Adkins,* 395 U.S. 653, 668, 674, 89 S.Ct. 1902, 1910, 1913, 23 L.Ed.2d 610 (1969). *Cf. Dynamics Research Corp. v. Analytic Sciences Corp.,* 9 Mass.App.Ct. 254, 278, 400 N.E.2d 1274, 1288 (1980) (an "agreement which seeks to restrict the employee's right to use an alleged trade secret which is not such in fact or in law is unenforceable as against public policy").

In *Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), the Supreme Court held that the policies underlying the federal patent laws outweighed principles of state contract law when a patent licensee wished to challenge the validity of the licensed patent. Thus, the Court held that a licensee was not estopped from challenging the validity of its patent in court, and rescinding the licensing agreement if successful.

In this case, the jury found that Raytheon had no trade secrets in its cvd process. The jury further found that Raytheon knew it had no trade secrets, yet asserted their existence in order to exact a licensing agreement from CVD and restrain competition.

Donadio and Connolly testified that, although they believed that no trade secrets existed, they agreed to sign the licensing agreement with Raytheon because they had no alternative. Donadio testified that threatened litigation with Raytheon would have foreclosed them from obtaining financing for their new company. Thus, the plaintiffs testified, the threat of litigation with Raytheon would have effectively prevented them from entering into the business. Both men had been asked to resign from Raytheon and were unemployed. However, since they did not believe that Raytheon possessed any trade secrets, there was no evidence that they "relied" on any material misrepresentation in entering into the license. Nor do these facts establish duress to the extent that the plaintiffs were placed " 'under the influence of fear as preclude[d] [them] from exercising free will and judgment.' " *See Coveney v. President & Trustees,* 388 Mass. 16, 23, 445 N.E.2d 136, 140 (1983) (*quoting Avallone v. Elizabeth Arden Sales Corp.,* 344 Mass. 556, 561, 183 N.E.2d 496, 499 (1962) ).

 Essentially, fraud under Massachusetts law is derived from the common law tort of deceit or misrepresentation. The practice at issue in this case, the assertion of claims in bad faith, is a predatory practice under the antitrust laws. As a cause of action, it descends directly from the *Walker Process* case and its progeny. Under the antitrust laws, plaintiffs need not necessarily be deceived. They are often simply the victims of the predatory practices of a powerful competitor who seeks to restrain competition or monopolize the market. The assertion of trade secret claims in bad faith has been identified as a predatory practice. *See A. & E. Plastik Pak, supra,* 396 F.2d at 715. Thus, the behavior complained of in this case is properly analyzed according to established principles of antitrust law, rather than under a common law fraud theory of action. Reliance, therefore, is not an essential element to be proven.

In *Perma Life Muffler, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), the Supreme Court held that the defense of *in pari delicto* is not a defense to an antitrust complaint. In that case, the Court held that the plaintiff-franchisees were not barred by their voluntary entry into the franchise agreements from maintaining an antitrust action against the defendant franchisor. The court found that:

> Although petitioners may be subject to some criticism for having taken any part in respondents' allegedly illegal scheme and for eagerly seeking more franchises and more profits, their participation was not voluntary in any meaningful sense. They sought the franchises enthusiastically but they did not actively seek each and every clause of the agreement. Rather, many of the clauses were quite clearly detrimental to their interests, and they alleged that they had continually objected to them. Petitioners apparently accepted many of these restraints solely because their acquiescence was necessary to obtain an otherwise attractive business opportunity.

*Id.* at 139, 88 S.Ct. at 1985 (emphasis added).

The defendant's conduct in this case presents a more sharply drawn example of overreaching. The plaintiffs objected strenuously to the terms of the agreement, and to the necessity for any license at all. Indeed, unlike the plaintiffs in the *Perma Life* case, who received substantial benefits in return for acquiescing to the agreements' allegedly anti-competitive terms, the plaintiffs here received no benefit from the agreement other than the right to use nonexistent trade secrets and Raytheon's promise not to engage in bad-faith litigation.

■ It should be noted that in *Copperweld Corp. v. Independence Tube Corp.*, — U.S. ——, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the Supreme Court partially overruled *Perma Life* to the extent that the *Perma Life* Court relied on an intra-enterprise conspiracy among a parent corporation and its subsidiaries as a "combination" in restraint of trade. The Court did not question its earlier rejection of the *in pari delicto* defense in antitrust actions, and specifically noted that the intra-enterprise conspiracy doctrine was not essential to the *Perma Life* decision and was "at most only an alternative holding." —— U.S. at ——, 104 S.Ct. at 2739. The *Copperweld* decision does not affect the conclusion that the doctrine of *in pari delicto* "is not to be recognized as a defense to an antitrust action." *Perma Life, supra,* 392 U.S. at 140, 88 S.Ct. at 1985. Indeed, the *Copperweld* Court reiterated that an agreement between a plaintiff and a defendant clearly may serve as the basis of section 1 complaint. —— U.S. at —— & n. 9, 104 S.Ct. at 2738–39 & n. 9.

Several courts have held that a plaintiff's complete, voluntary, and substantially equal participation in an allegedly illegal scheme precludes recovery for antitrust violations. *See, e.g., THI–Hawaii, Inc. v. First Commerce Financial Corp.,* 627 F.2d 991, 995 (9th Cir.1980); *Wilson P. Abraham Const. Corp. v. Texas Indus., Inc.,* 604 F.2d 897, 902 (5th Cir.1979), *aff'd sub nom.* 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981); *Columbia Nitrogen Corp. v. Royster Co.,* 451 F.2d 3, 16 (4th Cir.1971). The complete involvement defense is premised upon the "equitable consideration of preventing a windfall gain from the plaintiff's own wrongdoing." *THI–Hawaii, supra,* 627 F.2d at 996.

■ Although, in soliciting business, CVD held itself out as a licensee of Raytheon's proprietary technology, CVD's involvement cannot be said to be equal or complete. The evidence indicates that CVD vigorously protested the imposition of the licensing agreement only to be overwhelmed by a party in a superior bargaining position. Thus, the complete involvement defense is not applicable here. *Cf. Premier Elec. Constr. Co. v. Miller-Davis Co.,* 422 F.2d 1132, 1138 (7th Cir.), *cert. denied,* 400 U.S. 828, 91 S.Ct. 56, 27 L.Ed.2d 58 (1970).

In support of its position, Raytheon cites *Transitron Electronic Corp. v. Hughes Aircraft Co.*, 649 F.2d 871 (1st Cir.1981). In *Transitron*, this court considered whether a patent licensee could recover royalties already paid to a licensor when the licensing agreement is declared invalid. We held that a licensee must establish actual fraud on the part of the licensor against the licensee in order to recover back royalties. This holding was based upon "patent law policies and on the equities between licensor and licensee." Under a less stringent standard, a licensee would have "an incentive to delay challenging the patent, enjoying the competitive advantage of the license and avoiding the necessity of defending an infringement suit, secure in the knowledge that he could recoup his royalty cost later." *Id.* at 875. Allowing recovery of back royalties for gross negligence or so-called "technical" fraud would inject undue uncertainty into the royalty system. An honest, though negligent, licensor could be subjected to ruinous liability after the licensee had received the benefits of the license.

The present case is clearly distinguishable from *Transitron*. No royalties have been paid under the agreement. More significantly, in *Transitron* the district court found that the defendant had a "good faith belief" in the validity of the patent. *Id.* at 878. In this case, in addition to the essential elements of an antitrust claim, the jury found that Raytheon's assertion of trade secrets was in bad faith.

Raytheon also relies on *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979). In *Aronson,* the defendant had invented a new form of keyholder and applied for a patent. While the patent application was pending, the defendant entered into a licensing agreement with the plaintiff relating to her design. The agreement provided that the plaintiff-licensee would pay royalties of 5% of gross sales for use of the defendant's design. In the event that a patent was not obtained within five years, the royalty was to be reduced to 2½% of gross sales. After the patent application was rejected, the plaintiff sought a declaratory judgment that the royalty agreement was unenforceable.

The Supreme Court held that the agreement was not in conflict with federal patent law and was therefore valid and enforceable. The Court reasoned that the parties anticipated the risk that the patent would not issue, and specifically provided for this risk in the agreement. As consideration, the licensee received the benefit of inventor's new design immediately upon entering into the agreement, and was able to exploit the novelty of the device. The contract, the Court found, encouraged the federal interest in full disclosure of inventions or innovations. Therefore, the Court upheld the validity of the contract.

The *Aronson* case is clearly inapposite to the instant case. In *Aronson*, the parties, in good faith, made a bargain in which they considered and specifically provided for the risk of the patent application's failure. In return for the promise to pay royalties, the licensee was entitled to exploit immediately the licensor's novel invention. In this case, the plaintiff CVD received as consideration only Raytheon's forbearance from litigation, litigation that would have been conducted in bad faith. Since the jury found that Raytheon knew it had no trade secrets and that it asserted them in bad faith, there was no valid consideration for CVD's promise to pay royalties. The fact that CVD refused to pay any royalties under the agreement does not alter this result.

### Antitrust Injury

As an additional defense, Raytheon argues that the plaintiffs did not suffer the type of injury that the antitrust laws were designed to prevent. *See Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

In *Brunswick,* the Supreme Court explained that an antitrust plaintiff must prove more than injury causally related to an antitrust violation. A plaintiff must prove that its injury flowed from the anticompetitive nature of the defendant's acts:

Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause." *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. [100] at 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129.

429 U.S. at 489, 97 S.Ct. at 697–698 (emphasis in original) (footnote omitted). *See Engine Specialties, Inc. v. Bombardier Ltd.,* 605 F.2d 1, 12 (1st Cir.1979), *cert. denied,* 446 U.S. 983, 100 S.Ct. 2964, 64 L.Ed.2d 839 (1980).

In effect, the evidence indicates that Raytheon gave Donadio and Connolly three choices: (1) defend a trade secrets infringement suit against Raytheon; (2) refrain from competing with Raytheon in the manufacture of ZnS/cvd and ZnSe/cvd; or (3) take a license from Raytheon for the use of alleged trade secrets. All of the choices would have had an adverse economic impact on the plaintiffs, as well as an anticompetitive effect. Indeed, the first two alternatives would have been fatal to CVD's existence as a viable concern. Since Raytheon asserted its claim in bad faith, with the intent to restrain competition, it is the type of offense the antitrust laws are designed to prevent. The injury to CVD, legal expenses incurred in attempting to resolve Raytheon's bad faith claims, reflects the anticompetitive effect of acts with an anticompetitive intent. *See Handgards II, supra,* 743 F.2d at 1297; *Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.,* 562 F.2d 365, 374 (6th Cir.1977).

In *Handgards II, supra,* an antitrust case based on the bad faith assertion of patent claims, the defendant argued that its earlier offers to license the plaintiff precluded a finding of antitrust injury. The Ninth Circuit rejected this contention finding that, while licensing offers may be considered as evidence of good faith, "[a]ny offer to license a patent that it knew was invalid cannot preclude a finding of antitrust injury as a matter of law." *Id.* at 1295. The court, therefore, upheld the award of legal fees expended in defending bad faith litigation as a proper element of antitrust damages.

The fact that the plaintiffs here succumbed to the defendant's pressure in order to establish themselves as a manufacturer of ZnS/cvd and ZnSe/cvd does not deprive them of standing under the antitrust laws. Thus, we find that the district court properly upheld the jury's award of $1,060 for legal expenses incurred in attempting to resolve the original dispute with Raytheon.

### Instructions to the Jury

Raytheon also assigns as error the district judge's failure to instruct the jury that the inability of other firms to obtain comparable results in manufacturing ZnS/cvd and ZnSe/cvd is evidence that tends to show the existence of trade secrets in Raytheon's process and machinery. As indicated previously, the inability of competitors to reproduce a product or process tends to prove the existence of trade secrets. *See, e.g., Curtiss-Wright Corp., supra,* 381 Mass. at 11, 407 N.E.2d at 326, *Eastern Marble, supra,* 372 Mass. at 839, 364 N.E.2d at 802; *Junker v. Plummer,* 320 Mass. 76, 78, 67 N.E.2d 667, 668 (1946). Nevertheless, counsel for Raytheon did not properly object to the omission of this instruction, and, therefore, pursuant to Rule 51 of the Federal Rules of Civil Procedure, the failure to include the requested instruction cannot constitute reversible error.

Rule 51 in pertinent part provides:

No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating dis-

tinctly the matter to which he objects and the grounds of his objection.

Fed.R.Civ.P. 51. "We have held that Rule 51 means what it says: the grounds for objection must be stated 'distinctly' after the charge to give the judge an opportunity to correct his error." *Jordan v. United States Lines, Inc.*, 738 F.2d 48, 51 (1st Cir.1984). *See Ouimette v. E.F. Hutton & Co., Inc.*, 740 F.2d 72, 75–76 (1st Cir.1984); *McGrath v. Spirito*, 733 F.2d 967, 968–69 (1st Cir.1984). Reading a list of the numbers of the requested instructions is not sufficient to preserve an objection under Rule 51. *See Charles A. Wright, Inc. v. F.D. Rich Co.*, 354 F.2d 710, 713 (1st Cir.), *cert. denied*, 385 U.S. 890, 87 S.Ct. 14, 17 L.Ed.2d 122 (1966). What occurred in this case illustrates the necessity of requiring a strict interpretation and adherence to this rule.

In this case, the trial judge indicated to counsel at a conference after the close of evidence that he intended to give Raytheon's requested instruction, number 12, over the plaintiffs' objection. The next day, however, the district judge did not mention this instruction in instructing the jury. When the district judge finished instructing the jury, he asked counsel for their objections. Counsel for Raytheon objected to, among other things, the court's failure to give requested instructions "12, 16, 17, 18, 19, 20, and 21 [which] refer to the duty of an employee not to disclose, irrespective of the trade secret category . . . confidential information." It is apparent that this objection did not state "distinctly" the matter to which counsel objected or "the grounds of his objection." Indeed, it indicated a basis entirely unrelated to its present objection. Thus, it is impossible for this Court on appeal to know whether the district judge reconsidered his original decision that this instruction was proper, or simply omitted this instruction through inadvertence. By failing to state distinctly the grounds of his objection, as required by Rule 51, counsel for Raytheon deprived the district judge of the opportunity to correct his instructions before the jury retired. Therefore, any resulting er-

ror cannot be the basis for a reversal on appeal.

## Resubmission to the Jury

Raytheon also attacks the jury's damage award on the grounds that the damages interrogatory was improperly resubmitted to the jury after it returned an improper verdict, and that the district judge prejudiced Raytheon by informing the jury that the court would award attorney's fees if damages were awarded.

■ In response to the original damages interrogatory, the jury answered "Damages equal to all legal fees and court costs incurred in connection with this suit." The court indicated that this answer was not acceptable, and that the jury must reconsider and return with a proper reply. Raytheon's counsel objected to the resubmission to the jury, contending that the original answer should be construed as a finding of no damages. The court, however, found that the jury verdict was ambiguous in that the jury might have meant to include the $1,060 in legal fees, which related to the original trade secret claims in early 1980. The trial judge noted for the record that some jurors nodded affirmatively when he mentioned this in his resubmission instructions.

It is well-established that the court should ask a jury to correct its verdict when the jury has failed to follow the court's instructions in returning a verdict. *See, e.g., Merchant v. Ruhle*, 740 F.2d 86, 91 (1st Cir.1984); *Rios v. Empresas Lineas Maritimas Argentinas*, 575 F.2d 986, 990 (1st Cir.1978). Since it was reasonable for the court to have construed the verdict as being ambiguous, it was properly resubmitted to the jury. The court's instructions upon resubmission were correct, and included the possibility of a finding of zero or no damages.

■ Finally, Raytheon argues that the damages award should be overturned because the jury was informed that the court would award attorneys' fees and treble damages if damages were awarded.

The defendant made no objection at the trial. While it is generally not advisable to inform a jury of the treble damages or attorneys' fees provisions of the antitrust laws because of the danger that a jury may reduce a plaintiff's award to account for trebling, *see Pollock & Riley, Inc. v. Pearl Brewing Co.*, 498 F.2d 1240, 1243 (5th Cir. 1974), *cert. denied sub nom.* 420 U.S. 992, 95 S.Ct. 1427, 43 L.Ed.2d 673 (1975), any error that may have occurred was not preserved by timely objection. This court has held that the jury is presumed to have followed the instructions of the court. *Kukuruza v. General Elec. Co.*, 510 F.2d 1208, 1218 (1st Cir.1975). The district judge made it clear that legal fees were a matter for the court, and not within the discretion of the jury. In this case, the jury was given proper instructions and returned a proper verdict on resubmission. We, therefore, uphold the damages awarded to plaintiffs.

### Conclusion

Our review of the record leads us to conclude that there was sufficient evidence to support the jury's findings of fact. The exaction of a licensing agreement through the bad faith assertion of trade secrets by a party in a far superior bargaining position with the intention of restraining competition and monopolizing the market is a violation of the antitrust laws. The damages awarded were a direct and forseeable result of the anticompetitive conduct of the defendant, and, therefore, were proper.

Hence, we affirm the jury's verdict on the plaintiff's antitrust claims and the dismissal of the defendant's counterclaim. The appellees are awarded costs. The district court shall award a reasonable attorneys fee for services on appeal to the plaintiffs-appellees in accordance with 15 U.S.C. § 15.