**COCO RICO, INC., Plaintiff,**

v.

**Jose Luis FUERTES PASARELL, et al., Defendants.**

**Civ. No. 89–1055 (JAF).**

United States District Court,
D. Puerto Rico.

April 10, 1990.

---

Jorge Bermúdez–Torregrosa, Cuevas Kuinlam & Bermudez, San Juan, P.R., for plaintiff.

María Emilia Picó, Hiram R. Cancio, Cancio Nadal & Rivera, San Juan, P.R., for defendants.

## OPINION AND ORDER

FUSTE, District Judge.

The case was instituted by plaintiff Coco Rico, Inc. ("Coco Rico"), a manufacturer of

a coconut-flavored soft drink, in an attempt to enjoin codefendants from manufacturing a competing coconut-flavored beverage, Coco Frio. In response, codefendants José Luis Fuertes Pasarell ("Fuertes") and Myrna Skerrett de Fuertes ("Skerrett"), and their conjugal partnership, request this court to dismiss all claims filed against them by plaintiff Coco Rico. Codefendants Enlatadora del Patio, Inc. ("Enlatadora"), Empresas del Patio, Inc. ("Empresas"), and Robert Goss ("Goss") have asked for either a partial dismissal or partial summary judgment as regards the claims filed by Coco Rico against these parties. We grant both sets of motions and dismiss all of Coco Rico's claims against defendants.

## I. *Factual Background*

Coco Rico is a family business which first started marketing its coconut-flavored soft drink in Puerto Rico in 1934. The formula that served as the basis of the drink was patented the following year. Exhibit "C", Defendants' Motion to Dismiss and Memorandum of Law, Docket Document No. 7. In 1948, Coco Rico was organized as a corporation and appointed Luis R. Fuertes, father of codefendant Fuertes, as Chief Executive Officer. Fuertes, the son, worked at the company during summer vacations until permanently joining the business as director and officer of the corporation in 1971. His wife, Skerrett, also joined the business serving as an administrative assistant in management. By virtue of their positions, both Fuertes and Skerrett gained knowledge of the formula and manufacturing process used to produce Coco Frio.

In 1975, Fuertes and Skerrett resigned and sold their interest in the business to Carlos M. Fuertes and Ana Amelia Pasarell Vda. Fuertes, Fuertes' brother and mother.[1] As part of the Stock Purchase Agreement signed by all the parties, Fuertes and Skerrett agreed not to compete with Coco Rico for "ten years and a lifetime."[2] They also promised not to divulge the formula for the Coco Rico drink for the same period of time.[3] In return, Carlos M. Fuertes and his mother agreed to pay a price significantly above the market price for the shares. Indeed, they paid $319,150.83 for four hundred and forty-three (443) shares of common stock. By the terms of the agreement, Fuertes and Skerrett received $10,000 up front and arranged for a long-term payment plan for the remainder.

In 1983, Coco Rico was unable to meet the payment schedule set out in the original 1975 Stock Purchase Agreement. As a result, the parties restructured the payment plan in a Letter Agreement dated August 3rd, 1983. Under the Letter Agreement, the parties agreed to a total and complete release of prior obligations except as outlined in the new agreement. The new agreement provided Fuertes with preferred stock in Coco Rico and required him to abide by the non-divulging provision of the original purchase agreement.[4] The

---

1. Fuertes acquired forty-three shares of Coco Rico stock in 1960, and then inherited additional shares when his father died in 1968.

2. The non-competition clause was contained in Article 8 of the Stock Purchase Agreement and reads as follows:
 8. Seller agrees that during a period of ten years from the date of execution of this agreement and during his lifetime he shall not compete directly or indirectly with Coco Rico in the manufacturing or sale of the essence of coconut for coconut flavored beverages.... Exhibit "A", Defendants' Motion to Dismiss and Memorandum of Law, Docket Document No. 7.

3. Article 9 of the Stock Purchase Agreement contains the "non-divulging clause":
 9. Seller recognizes that the formula and method for the manufacturing of the essence of coconut that Coco Rico processes is a valuable secret, therefore, essential for the surviv-

al of the corporation and its economic viability, as well as that of other buyers, to pay the price for the shares acquired from Seller. Therefore, Seller agrees that during the above referred term of ten years and in addition during his lifetime, as an essential condition to this contract, never to reveal to any person or entity directly or indirectly any information pertaining to the formula or process for the preparation and manufacturing of the referred product, maintaining said information always secret and in strict confidentiality. Exhibit "A", Defendants' Motion to Dismiss and Memorandum of Law, Docket Document No. 7.

4. The specific language of the Letter Agreement is as follows:
 2. Luis (defendant) shall execute a total and absolute release in favor of (defendant's brother), Ana Amelia (his mother) and Coco Rico, Inc. regarding any obligation arising

Letter Agreement did not mention the non-compete clause originally subscribed to by the parties.

The record indicates that Fuertes reentered the soft drink business in 1985. Specifically, Fuertes formed a partnership with Goss, F & G Concentrates, to manufacture "coconut essence" for use in carbonated beverages. In 1986, the coconut essence was first sold to Cervecería India to produce Coco India. The following year the concentrate was used in Coco Frío, a coconut-flavored soft drink manufactured and distributed by Enlatadora, Goss' company. Upon learning of Fuertes' association with the competing soft drink, Coco Frío, Coco Rico instituted this action.

## II. *Discussion*

Coco Rico claims that Fuertes violated both the non-compete clause and non-divulging clause of the Stock Purchase Agreement signed in 1975 by assisting in the production of Coco Frío. In addition, plaintiff claims that the logo "Coco Frío" infringes Coco Rico's federally-registered trademark. Coco Rico has also asserted claims against Goss, F & G, and Enlatadora, alleging tortious interference with Fuertes' contractual obligations to Coco Rico. Finally, Coco Rico claims that all defendants committed acts of unlawful and unfair competition under Puerto Rico Law No. 77 of 1964, 10 L.P.R.A. § 259. Defendants request the Court to dismiss all aforementioned claims.[5]

from the sale of stock above mentioned, fully accepting the obligation described in subparagraph 1 above in substitution of any prior obligations assumed by you and the corporation stemming from the purchase of stock. 3. Likewise you (plaintiff) will execute a similar release in favor of Luis (defendant) except that his obligation regarding the divulging of Coco Rico's formula continues.
Exhibit "B", Defendants' Motion to Dismiss and Memorandum of Law, Docket Document No. 7.

5. Judgment pursuant to a motion to dismiss will not be granted unless the movant clearly establishes there are no material issues of fact and that the complaint fails as a matter of law. 5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1357 (1969). For purposes of this motion, we will analyze the complaint in the light most favorable to the plaintiff and accept the allegations stated therein as true. *Id.*

## A. *The Non–Compete Clause*

 Defendants argue that the Letter Agreement signed by the parties in 1983 constituted a novation of the 1975 Stock Purchase Agreement. Specifically, Fuertes claims that the Letter Agreement extinguished his obligation not to compete as required under the original agreement. We agree.

Article 1110 of the Puerto Rico Civil Code provides that obligations are extinguished by novation. 31 L.P.R.A. § 3151. The extinction of an obligation by novation occurs whenever a party expressly declares its substitution by another or when the old and new agreements are incompatible on all points. Article 1158 of the Puerto Rico Civil Code, 31 L.P.R.A. § 3242. Paragraphs 2 and 3 of the Letter Agreement provide for "total and complete releases between the parties" upon acceptance of the terms of the letter "in substitution of any prior obligation ... stemming from the Stock Purchase Agreement." The Letter Agreement made only one exception to the otherwise blanket release: the agreement not to divulge the "secret" Coco Rico formula. Consequently, the court finds that the novation extinguished Fuertes' obligations under the non-compete agreement.[6]

 Even were we to find no novation, we would still not hold Fuertes to the non-compete agreement. Contractual restric-

6. Coco Rico argues that the novation theory is inapplicable as Skerrett, a signatory to the Stock Purchase Agreement, did not sign the subsequent Letter Agreement. We find this a technicality with no significant legal effect. The payments pursuant to the Stock Purchase Agreement were issued to Fuertes and it is Fuertes Coco Rico seeks to restrain from competing. Furthermore, novation applies not only because the parties indicate an intention to submit themselves to a new obligation with new agreements, but also because the new agreement is incompatible with the old one. That is certainly the case here. One cannot be "released" from all prior obligations and still be bound by them. One agreement must dominate, and the court finds the Letter Agreement to be the final binding agreement on the parties.

tions on a seller of a business[7] must be "reasonable in scope." 2 J.T. McCarthy, *Trademarks and Unfair Competition,* § 28:7. at 390 (1984). Reasonableness is measured in terms of (1) time duration, and (2) territorial coverage. McCarthy at 392. A finding of reasonableness involves a balancing of these two factors; for example, a restriction unlimited in time may be reasonable if limited in territorial coverage, and vice versa. The covenant not to compete in the current case, however, has no limits. Indeed, it restricts Fuertes from competing with Coco Rico anywhere in the world for the rest of his lifetime. The Court finds that this restriction is not only unreasonably oppressive on the seller but also injurious to the public at large because it impedes the free flow of competition. *See Mattis v. Lally,* 138 Conn. 51, 82 A.2d 155 (1951).

When faced with an "unreasonable" covenant, courts may either reform the covenant or find it void and unenforceable. McCarthy at 393. We see no need to choose between the two options because in the instant case the result is the same: Fuertes is not bound by the covenant not to compete. If we consider the clause as null and void, Fuertes could have competed with Coco Rico at any time. If we reform the covenant, we would have to follow as closely the language already agreed to by the parties. Thus, should we choose to rewrite the clause, the logical, reasonable duration of the restraint would be ten years. Since the Stock Purchase Agreement was signed in 1975, Fuertes would be free, under the reformed clause, to compete in 1985. The record indicates that Fuertes did not reenter the soft drink market until 1985, after the expiration of the "reformed" time limitation.

Consequently, plaintiff Coco Rico has not forwarded any legal argument persuading us that Fuertes is bound by the non-compete clause contained in the 1975 Stock Purchase Agreement. As a result, we grant codefendants Fuertes and Skerrett's motion to dismiss as concerns this claim.

B. *The Non–Divulging Clause*

 Fuertes' promise not to reveal the secret formula base of Coco Rico survives the substitution of obligations outlined in the 1983 Letter Agreement. However, in order for this court to determine whether Fuertes did indeed reveal this secret in manufacturing the competing Coco Frío, thereby violating the non-divulging clause, we must first consider whether the formula is a "trade secret" worthy of protection.[8] McCarthy at 436.

Trade secret protection may be afforded to any idea or process valuable or useful in one's business which is not generally known. A trade secret is any special knowledge developed through skill and ingenuity and the expenditure of money and effort, which, by being secret, gives the owner an advantage over his competitors. *Dickerman Associates v. Tiverton Bottled Gas,* 594 F.Supp. 30 (D.Mass.1984); *Atlantic Wool Combing Co. v. Norfolk Mills, Inc.,* 357 F.2d 866 (1st Cir.1966). In determining whether a particular process is entitled to protection, the Court must consider the degree of secrecy surrounding it, the efforts expended in developing it and preserving its secrecy, its value to plaintiff and defendant, and the difficulty of duplicating it. *Dickerman,* 594 F.Supp. at 35; *Rapco Foam, Inc. v. Scientific Applications,* 479 F.Supp. 1027, 1029 (S.D.N.Y. 1979).

Secrecy, then, is the hallmark of trade secret protection. Once a trade secret enters the public domain, the possessor loses his exclusive rights to the trade secret. *CVD, Inc. v. Raytheon Co.,* 769 F.2d 842, 851 (1st Cir.1985). Under this analysis,

---

**7.** The parties in their briefs have characterized the obligations at issue as "employee covenants not to compete." However, because the sale of the stock really constituted a sale of Fuertes' interest in the business to the rest of the family, we will treat the covenants as contractual restrictions on the seller of a business. Courts should be more hesitant to disturb these covenants because sellers and purchasers of businesses are presumed to have equal bargaining power.

**8.** The fact that the clause forces the seller to acknowledge the formula as a "secret" does not mean it is a "trade secret" in the eyes of the law. McCarthy at 437.

plaintiff Coco Rico has no claim to trade secret protection. The secret formula at issue the time Fuertes signed the 1975 Stock Purchase Agreement (and revitalized in the 1983 Letter Agreement) was a subject of a patent issued in 1935.[9] Exhibit "C", Defendants' Motion to Dismiss and Memorandum of Law, Docket Document No. 7. As required by the Patent Act, Coco Rico made a full and complete disclosure of the formula base then used for producing its soft drink. 35 U.S.C. § 112. A patent affords its owner a legal monopoly for a period of time in return for this disclosure. After the expiration of the statutory period, the patentee loses all exclusive rights to the patent. *CVD, Inc.,* 769 F.2d at 852.

Coco Rico lost patent protection for its soft drink formula in 1952. Accordingly, all claims to secrecy surrounding the formula were also extinguished upon the expiration of the patent. The formula, therefore, is not a valid "trade secret." Coco Rico argues that while the formula may be public knowledge, it is still entitled to enjoin Fuertes from divulging any information regarding its manufacturing process. The process for producing fruit-flavored soft drinks, however, is common knowledge in the industry. Compare Exhibit "D" to Exhibit "C", Defendants' Motion to Dismiss and Memorandum of Law, Docket Document No. 7. Employers, moreover, cannot restrict employees from appropriating and using the general skill or knowledge acquired during the course of employment. *CVD, Inc.,* 769 F.2d at 852.

We find, therefore, that no "trade secret" exists warranting an injunction against Fuertes. Because of the absence of a trade secret, we conclude that Fuertes did not breach his fiduciary duty to Coco

Rico or the non-divulging clause of the Stock Purchase Agreement. As a result, we dismiss Coco Rico's claims concerning the non-divulging clause against co-defendants Fuertes and Skerrett.

### C. *Claim for Tortious Interference with Contract*

Plaintiff has also filed claims against Goss, F & G Concentrates (the partnership) and Empresas/Enlatadora[10] (manufacturer) charging that they tortiously interfered with the duties owed Coco Rico by Fuertes. However, because we find that Fuertes was under no contractual or fiduciary obligation to Coco Rico, we see no basis for the tort claims against these defendants. Consequently, we grant their motion to dismiss as to these allegations.

### D. *Trademark Infringement*

Plaintiff's final claim is that the Coco Frío logo infringes its registered trademark, Coco Rico. Defendants in their motion to dismiss argue that Coco Rico is estopped, by the equitable doctrine of laches, from bringing the infringement action because of the coexistence of the two marks in commerce for over twenty years without objection by plaintiff. In order to resolve these allegations, the Court must engage in a two-step analysis. First, we must determine whether Coco Rico is estopped from bringing a trademark infringement claim. If we find the doctrine of laches inapplicable, we must go on to decide whether Coco Frío does, indeed, infringe Coco Rico's trademark.

#### (1) *Laches*

■ The name Coco Frío was registered on the supplemental register of the Office of Patents and Trademarks in 1968 and in 1972 it received "incontestible" status by

---

9. Defendants also argue that the formula currently used by Coco Rico is different from the formula registered under the original patent. Therefore, defendants conclude, any appropriation of information other than the formula currently in use is fair game for defendants. We disagree. Whether or not the formula is currently in use is irrelevant to the issue of whether or not Coco Rico had a trade secret worthy of protection at the time Fuertes signed the agreement not to divulge.

10. Plaintiffs have failed to show any connection between the alleged tortious acts and the company Empresas. Consequently, we dismiss at the outset Coco Rico's allegations against Empresas. We will consider the claims against codefendant Enlatadora which admits to buying the coconut essence from F & G and using it to manufacture and distribute Coco Frío. Sworn Statement of Goss, Exhibit "B", Defendants' Motion for Partial Dismissal/Summary Judgment, Docket Document No. 19.

being published on the principal register. Exhibits "E" and "F", Defendants' Memorandum. Fuertes, however, was not the registrant; the original owner of the trademark then was City Club Beverage Corp. ("City Club"), which manufactured carbonated coconut-flavored drinks to be distributed in the Northeast. The record indicates that Coco Rico was aware of the competing coconut soft drink and that it did not take any administrative or judicial action against City Club. *See* Exhibit "G", Defendants' Memorandum. City Club, in turn, lost its rights to the mark when it failed to file a renewal application with the Office of Patents and Trademarks within twenty years of the original registration. *See* 15 U.S.C. § 1059. In 1988, codefendants Fuertes and Goss filed a new application with the Office of Patents and Trademarks seeking to re-register the logo Coco Frío with themselves as the owners. Plaintiff, shortly afterwards, filed a trademark infringement action against defendants.

Defendants charge that Coco Rico's infringement action is estopped by virtue of the doctrine of laches. Laches and equitable estoppel are some of the legal defenses available to an infringement action brought under the Lanham Act. Specifically, Section 33(a) of the Act provides that registration shall not preclude a party from proving any legal or equitable defenses or defects which might have been asserted if such mark had not been registered. 15 U.S.C. § 1115(a); *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 373 (1st Cir. 1980).

Estoppel by laches requires the court to consider all equitable factors relevant to the case. After analyzing the record we decline to apply the doctrine. Coco Rico did not pursue any action against City Club; however, that delay does not preclude Coco Rico's claims against defendants. Laches should be measured from the date defendants' acts first impacted plaintiff's business reputation, not when the competing mark is first used. 2 J.T. McCarthy, *Trademarks and Unfair Competition*, § 31:6 at 570 (1984). Indeed, a senior user cannot be guilty of laches until his right ripens into one entitled to protection. *Id.*

Plaintiff Coco Rico must demonstrate a "likelihood of confusion" between two competing marks in order to make out a claim of trademark infringement. Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1). Coco Rico reasonably delayed in pursuing action against City Club as the distribution of their Coco Frío was limited to the Northeast and did not extend to Puerto Rico. Courts have held that a plaintiff's failure to object to uses in limited territories "does not bar it from objecting later to widespread use of the mark." *See Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362 (6th Cir.1985). In addition, Coco Rico has filed an opposition to defendants' registration application for the trademark Coco Frío. Exhibit "6", Plaintiff's Opposition, Docket Document No. 35. One court has held that a filing in opposition of federal trademark registration "tolls" the running of laches as to litigation to stop defendant's use of the mark. *Citibank, N.A. v. Cititrust*, 644 F.Supp. 1011 (E.D.N.Y.1986).

We do not find that plaintiff Coco Rico "slept on its rights" and therefore should be estopped from asserting its trademark infringement claim. On the contrary, the record shows that it was Coco Frío's entry into the Puerto Rico market that triggered Coco Rico's entitlement to trademark protection. Before that time, Coco Rico had no reason nor right to pursue legal action against the use of the Coco Frío trademark.

#### (2) *Likelihood of Confusion*

■ We have decided, therefore, that Coco Rico has a valid claim to trademark protection. The issue remains, however, of whether it is entitled to enjoin the production of Coco Frío. In order to obtain an injunction against a competitor, plaintiffs must show a "likelihood of confusion" between the two marks by the relevant consuming public. Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 28 (1st Cir.1989).

The First Circuit has identified eight factors to be considered in determining likelihood of confusion: (1) the similarity of

the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of plaintiff's mark. *Id.* at 29; *Astra Pharmaceutical Prod. v. Beckman Instruments,* 718 F.2d 1201 (1st Cir.1983); *Pignons S.A. de Mecanique v. Polaroid Corp.,* 657 F.2d 482 (1st Cir.1981).

The crux of Coco Rico's likelihood of confusion argument is that the logos on the two products both contain a coconut and palm tree motif illustrated in green and white. Coco Rico cannot take issue with the competing name of defendants' product, which contains the "descriptive" term "coco" and a second, different word "frío". In addition, the record indicates that while both products are carbonated coconut-flavored soft drinks, the formulas used in the two drinks are different, and therefore, the taste of each product is distinctive.[11]

Mere similarity in the logos is insufficient to show a "likelihood of confusion." "Similarity is determined on the basis of the total effect of the designation, rather than a comparison of the individual features." *Pignons,* 657 F.2d at 487. Defendants have submitted three other coconut-flavored soft drinks which use the exact same motif in green and white (Coco India, Coconut Ritz, Coco Lanio). This evidence indicates that the consuming public associates coconuts, palms and the colors green and white with coconut-flavored drinks in general, not with Coco Rico specifically. Coco Rico, moreover, has not submitted any evidence showing actual confusion by consumers. Indeed, the deposition of the President, Carlos M. Fuertes, indicates that Coco Rico knows of no instance of consumer confusion as to origin. Furthermore, the fact that Coco Rico chose only Coco Frío as the target of its infringement claim

suggests a motive other than protection of its trademark. Consequently, weighing all the factors together, we find that Coco Rico has failed to demonstrate sufficient facts to sustain a claim of trademark infringement by Coco Frío. We therefore grant defendants' motion to dismiss the trademark infringement claim lodged against Fuertes and Skerrett.

### III. *Conclusion*

We hereby grant codefendants Fuertes and Skerrett's motion to dismiss the claims arising from the contractual duties outlined by the 1975 Letter Agreement and Coco Rico's charge of trademark infringement. We grant co-defendants' Goss, F & G, and Empresas/Enlatadora's motion to dismiss Coco Rico's action based on tortious interference with contract. We dismiss plaintiff's pendent Puerto Rico law claims, without prejudice, for want of jurisdiction. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Rafael Figueroa Ruiz v. José E. Alegría,* 896 F.2d 645 (D.P.R.1990). Costs to be taxed by the Clerk; each party to bear its own attorney's fees.

IT IS SO ORDERED.

---

11. The record indicates that sometime after 1978 Coco Rico was forced to change the content of the coconut base used in its soft drink. *See United States v. An Article of Food, etc.,* 584 F.Supp. 230 (D.P.R.1984). The deposition of Coco Rico's current president, Carlos M. Fuertes, confirms the fact the company after 1975 incorporated different ingredients in the manufacturing of Coco Rico. Deposition Carlos M. Fuertes, filed as part of Docket Document No. 55, at pp. 86–87.