<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 UNITED STATES COURT OF APPEALS
                     FOR THE FIRST CIRCUIT
                      ____________________

No. 97-1804

                          ERIC WILSON,
                      Plaintiff, Appellee,

                               v.

               MARITIME OVERSEAS CORPORATION and
                    CAMBRIDGE TANKERS, INC.,
                     Defendants, Appellant.

                      ____________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

          [Hon. Joseph L. Tauro, U.S. District Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

                 Aldrich, Senior Circuit Judge,

                   and Lynch, Circuit Judge.

                     _____________________

    Thomas E. Clinton, with whom Clinton & Muzyka, P.C., was on
brief for Maritime Overseas Corporation and Cambridge Tankers, Inc.
    Michael B. Latti, with whom Carolyn M. Latti and Latti
Associates LLP, were on brief for Eric Wilson.

                      ____________________

                        July 10, 1998
                     ____________________

         TORRUELLA, Chief Judge.  Eric Wilson, chief mate on an ocean-
going oil tanker owned by defendant-appellant Cambridge Tankers,
 Inc., was injured during a voyage as he attempted to repair
hydraulic fluid lines that were leaking inside one of the main
  cargo holds.  He filed suit in the district court against
 Cambridge Tankers, as well as against his employer, Maritime
Overseas Corporation, asserting claims under the Jones Act, 46
U.S.C.  688, for negligence, and under the general maritime law
for unseaworthiness and for maintenance and cure.  After trial,
the jury awarded Wilson $2,000,000 in compensatory damages.  The
defendants now appeal from the verdict, arguing that the district
court erred both in failing to instruct the jury on comparative
negligence and the primary duty rule, and in denying their motion
 for a remittitur.  We remand for a new trial on all issues.
                        I.  Background
         "We . . . review the evidence developed at trial in the light
most favorable to [the verdict]."  Toucet v. Maritime Overseas
            Corp., 991 F.2d 5, 7 (1st Cir. 1993).
         The plaintiff, Eric Wilson, was employed as a chief mate by
Maritime Overseas Corporation on the M/T OVERSEAS BOSTON, which
was owned, operated, and controlled by Cambridge Tankers, Inc.
 (collectively, "the defendants").  On January 19, 1994, the
OVERSEAS BOSTON was approximately 75 miles off the western coast
of Mexico on its way to Valdez, Alaska.  The plaintiff was in a
Zodiac inflatable raft in the vessel's No. 2 center cargo tank
 ("tank No. 2C") trying to patch two leaking hydraulic lines.
         The decision to patch the lines while the OVERSEAS BOSTON was
underway was made jointly by the captain, the chief engineer, and
Wilson, the chief mate.  Several hydraulic lines had been leaking
since at least 1991, and Wilson and others had placed numerous
 requests with the vessel's owners to replace the lines at a
shipyard.  The hydraulic lines, made out of copper beryllium,
control the valves that regulate the flow of petroleum into and
out of the ship.  The leaks in the lines were a constant source
of worry on the OVERSEAS BOSTON because, if the hydraulic system
failed, the valves could open without warning, creating the
possibility of an oil spill.  The defendants' established
procedure for patching hydraulic lines was to fill the tank with
seawater to a height sufficient to allow a seaman on a raft
floating inside the tank to reach the hydraulic line in question.  
The leaking section of pipe is then cut and replaced with a new
stainless steel section.  There was no other equipment available
on the OVERSEAS BOSTON with which to repair the lines.
    The lines that Wilson was patching on the day of the accident ran
vertically down one side of tank no. 2C.  These lines were
leaking near the top of the tank, which is seventy-five feet
deep.  To reach the lines, Wilson had the tank filled up to
approximately the sixty-five foot mark, so that the raft could
float within eight to ten feet of the deck above.  However, the
underside of the deck on the OVERSEAS BOSTON is spanned from port
to starboard by large metal I-beams, whose vertical span is about
five feet.  Thus, the clearance between the bottom of each beam
and the surface of the water was only approximately three to five
feet.
    Wilson and a seaman climbed aboard the raft, and Wilson knelt in
the forward section to paddle the raft toward the leaking lines.  
The beams were about one or two feet above his head.  Proceeding
in this manner, Wilson and the seaman went under two beams
without incident.  Unbeknownst to Wilson, however, the vessel
changed course while he was still paddling.  Although the captain
and officers on the bridge knew that Wilson was in the tank, and
could communicate with him by hand-held radio, they failed to
warn him of the impending change of course.  Unfortunately, there
was a wave in the tank (attributed by Wilson to the change in
course), which lifted the raft and slammed Wilson against a beam.
    Although he was in pain, Wilson assumed that he had not been
seriously injured, and decided to continue patching the lines.  
When he exited the tank about an hour later, he mentioned to the
chief engineer that he had hurt his back.  The captain examined
Wilson's back, and told him to rest in his cabin until he felt
better.  The pain did not go away, however, and Wilson left the
ship to be examined by doctors.  He was told at first that his
pain was most likely due to a bad sprain and injury to the soft
tissues along his spine.  After several months, however, Wilson
was still in pain, especially when he bent his back or climbed
stairs.  Wilson thus consulted a second doctor, who determined
that Wilson had fractured his spine at the T8 vertebra.  Wilson
remained on medical leave the rest of 1994, during which he
underwent various rehabilitative treatments for his injury,
including wearing a back brace for four months, and receiving
frequent steroid injections to build up the muscles in his back.
    In January 1995, Wilson's condition had improved enough that he
was allowed to go back to work as a chief mate on a trial basis.  
He was assigned to work on the OVERSEAS NEW YORK while it was
moored for maintenance and repairs in Portland, Oregon.  This
trial period lasted for sixty-five days, during which it became
apparent that Wilson's ability to perform his duties as a chief
mate was compromised by the pain that he frequently suffered
while climbing stairs or performing other physically-strenuous
tasks.  Nevertheless, his performance of other duties was
exemplary, and he was recommended for promotion to captain, which
was a less physically-demanding job.
    During the summer of 1995, in preparation for his imminent
promotion, he was assigned to the OVERSEAS CHICAGO for
approximately one month attached to its captain in preparation
for his own promotion to captain.  Captain Olsen, the OVERSEAS
CHICAGO's captain, reported that Wilson had performed very well,
and that his promotion was both warranted and due.  A short time
later, Wilson was asked to obtain a medical certificate that he
was fit for administrative duties as captain.
    After obtaining a certification that he was fit for
administrative duty as a captain, Wilson was assigned to relieve
Captain Olsen on the OVERSEAS CHICAGO, which was berthed in
Portland, Oregon.  On August 15, 1995, he flew out to Portland,
went to the OVERSEAS BOSTON, and exchanged command of the ship
with Captain Olsen.  An hour or two later, Captain Olsen returned
and told Wilson that he had to speak to his superiors at Maritime
Overseas' headquarters in New York.  When Wilson placed the call,
he was told that the medical certificate was not satisfactory,
because it did not certify that he was fully fit for any duty on
the ship.  Captain Olsen was ordered to relieve Wilson of his
command and march him off the ship.  Wilson was given $500 and
told to stay at a nearby hotel until the matter could be sorted
out.  However, after waiting several days without hearing
anything further, Wilson flew back to his home in Maine.
    Soon afterwards, Wilson filed the instant suit in the U.S.
District Court for the District of Massachusetts, alleging  both
diversity and federal question jurisdiction.  See 28 U.S.C.
1331, 1332.  In his complaint, Wilson claimed that his
injuries were caused both by the OVERSEAS BOSTON's unseaworthy
condition and by the bridge officers' failure to warn him of the
impending course change.  In their answer to the complaint, the
defendants denied Wilson's allegations of unseaworthiness and
negligence, and claimed as affirmative defenses that the sole
cause of Wilson's injuries was either his own negligence, or his
failure to properly perform his duties as chief mate.  
    A jury trial started on February 10, 1997.  At the end of the
plaintiff's case, the defendants moved for judgment as a matter
of law on the unseaworthiness and negligence claims.  On
February 19, 1997, the last day of trial, the district court
summarily denied the motion.  The court also denied the
defendants' request that he instruct the jury on comparative
negligence and the primary duty rule, as well as their request
that the jury questionnaire contain questions on those
affirmative defenses.   
    The following day, the jury returned a special verdict for
Wilson, finding that the OVERSEAS BOSTON was unseaworthy, that
the defendants had been negligent, that both the unseaworthiness
and negligence had been proximate causes of Wilson's injuries,
that his pre- and post-judgment damages totaled $2,000,000, and
that he was entitled to pre-judgment interest.  On February 28,
1997, the district court entered judgment in accordance with the
verdict in the amount of $2,139,804.93.   
    The defendants timely filed three post-judgment motions: a
renewed motion for judgment as a matter of law, a motion for a
new trial, and a motion for remittitur.  The district court
denied all three motions by means of a one-page order dated June
5, 1997.  The defendants now appeal from the denial of their
motions.

II.  Objections to instructions
A.  Standard of review
    The defendants' primary argument is that the jury's verdict
should be set aside and the case remanded for a new trial because
the jury instructions and questionnaire were incorrect as a
matter of law, and because these errors prejudiced them.  Before
reaching the merits of the defendants' objections, however, we
must resolve the threshold issue of whether the defendants
properly preserved their objections.
    Objections to instructions must comply with Fed. R. Civ. P. 51,
which provides in pertinent part:
    No party may assign as error the giving or the failure to give an
    instruction unless that party objects thereto before the jury
    retires to consider its verdict, stating distinctly the matter
    objected to and the grounds of the objection.

Objections must also comply with Fed. R. Civ. P. 49(a).  Rule
49(a) permits a court to require a jury to return only a special
verdict in the form of a special written finding upon each issue
of fact, and requires the court to give such instructions to the
jury "concerning the matter thus submitted as may be necessary to
enable the jury to make its findings upon each issue."  More to
the point, Rule 49(a) further provides:
    If in so doing, the court omits any issue of fact raised by the
    pleadings or by the evidence, each party waives the right to a
    trial by jury of the issue so omitted unless before the jury
    retires the party demands its submission to the jury.

Both Rule 49(a) and Rule 51 thus require the objecting party to
state its objections after the charge but before the jury
retires.  "The object of [these rules] is to afford the trial
judge an opportunity upon second thought, and before it is too
late, to correct any inadvertent or erroneous failure to charge."  
Marshall v. Nugent, 222 F.2d 604, 615 (1st Cir. 1955).
    Thus, "[s]ilence after instructions, including instructions on
the form of the verdict to be returned by the jury, typically
constitutes a waiver of any objections."  Putnam Resources v.
Pateman, 958 F.2d 448, 456 (1st Cir. 1992).  It must be
emphasized that "[i]t is an ironclad rule in this circuit that
failure to renew objections after the charge constitutes waiver
of any claim of error."  United States v. Richardson, 14 F.3d
666, 670-71 (1st Cir. 1994) (citation omitted) (emphasis added);
see also Marshall, 222 F.2d at 615.
    If a party's objections comply with Rules 49(a) and 51, "then the
'harmless error' standard of Rule 61 governs the trial or
appellate court's consideration of any request for relief based
on the alleged error."  Scarfo v. Cabletron Sys., Inc., 54 F.3d
931, 939 (1st Cir. 1995).  Rule 61 provides that "[n]o error . .
. in anything done or omitted by the court . . . is ground for
granting a new trial . . . unless refusal to take such action
appears to the court inconsistent with substantial justice."  
Fed. R. Civ. P. 61; see also 28 U.S.C.  2111; Fed. R. Crim. P.
52.  An error is not harmless if the court is "in grave doubt as
to the harmlessness of an error that affects substantial rights."  
O'Neal v. McAninch, 513 U.S. 432, 445 (1995); see also Scarfo, 54
F.3d at 939-40 (citing  O'Neal).
    The failure to preserve objections does not entirely preclude our
review.  In such cases, however, we review only for plain error.  
See Moore v. Murphy, 47 F.3d 8, 11 (1st Cir. 1995).  "For an
error to be such, it must indeed be 'plain,' or 'obvious,' . . .
and it must 'affect substantial rights,'  Fed. R. Crim. P. 52(b),
that is, '[i]t must have affected the outcome of the district
court proceedings.'"  United States v. Fernndez, ___ F.3d ___,
1998 WL 263427 at *3 (1st Cir. May 29, 1998) (citation omitted)
(emphasis added).  Thus, whereas plain error review permits
reversal only when the court is certain that substantial rights
were affected, harmless error review requires reversal whenever
the court harbors grave doubts as to whether the alleged error
affected substantial rights.
    Moreover, even when a district court's instructions are plainly
erroneous, we will not remedy any such errors "[u]nless [we
conclude] that the charge has caused a miscarriage of justice or
has undermined the integrity of the judicial process."  Scarfo,
54 F.3d at 940.  Otherwise, "the charge is treated as having an
effect closely analogous to [the] law-of-the-case doctrine, and
for similar reasons of policy and fairness of process."  Id.; see
also  Coy v. Simpson Marine Safety Equip., Inc., 787 F.2d 19, 25
(1st Cir. 1986); Carrillo v. Sameit Westbulk, 514 F.2d 1214, 1219
(1st Cir. 1975); Bouley v. Continental Cas. Co., 454 F.2d 85, 88
(1st Cir. 1972); Dunn v. St. Louis, San Francisco R.R. Co., 370
F.2d 681, 684 (10th Cir. 1966) (Aldrich, J., sitting by
designation); see generally United States v. Olano, 507 U.S. 725
(1993) (under Fed. R. Crim. P. 52(b), a forfeited claim of error
may be noticed on appeal only if error is plain, affects
substantial rights, and a miscarriage of justice would otherwise
result).
    Satisfying Rule 51 requires more than a timely objection.  The
party making the objection must also state "distinctly the matter
objected to and the grounds for the objection."  Fed. R. Civ. P.
51.  "Failure to object with the requisite particularity forfeits
review under the 'harmless error' rule."   Play Time, Inc. v.
LDDS Metromedia Comm., Inc., 123 F.3d 23, 29 (1st Cir. 1997).
    This is not a merely technical requirement serving no useful end.  
    Trial judges are not mind readers.  If there is a problem with
    the instructions, the judge must be told precisely what the
    problem is, and as importantly, what the attorney would consider
    a satisfactory cure.

Linn v. Andover Newton Theological Sch., 874 F.2d 1, 5 (1st Cir.
1989).  Thus, for example, this circuit has previously held that
where a district court had first indicated that it intended to
give an instruction, but later failed to do so, the appellant's
reading a list of the numbers of the requested instructions was
not sufficient to preserve an objection under Rule 51.  See CVD,
Inc. v. Raytheon Co., 769 F.2d 842, 858-59 (1st Cir. 1985).  The
panel stated that, because the objection was not accompanied by
any argumentation, it was "impossible for this Court on appeal to
know whether the district judge reconsidered his original
decision that this instruction was proper, or simply omitted this
instruction through inadvertence."  Id.  
    Finally, we note that objections to instructions need not be
formal; "it is sufficient that a party . . . makes known to the
court the action which the party desires the court to take or the
party's objection to the action of the court and the grounds
therefor."  Fed. R. Civ. P. 46 (emphasis added); see alsoCarrillo, 514 F.2d at 1218.  The emphasis is not on the form of
objections, but rather on ensuring that the trial court had
actual notice of the nature and grounds of the objection.  In one
case, therefore, a prior panel of this court found that a party
had preserved its objections under Rule 51 by reserving them in
advance, when it was clear that the court had understood the
objections.  See Bouley, 454 F.2d at 88; cf. Harrington v. United
States, 504 F.2d 1306, 1316-17 (1st Cir. 1974) (objections were
preserved by brief post-charge statement on the record, where
parties had discussed the requested instructions with the judge
at length but off the record).  However, "we warn parties that
there is a heavy burden upon them in such event to show that it
was done with sufficient specificity and distinctness, and we
caution district courts to be slow in tolerating such procedure."  
Dunn, 370 F.2d at 685.
    Thus, we must determine whether the defendants properly preserved
their objections to the district court's decision not to charge
the jury on their affirmative defenses.  If the objections were
preserved, then we evaluate whether the district court's decision
was erroneous.  Finally, if the district court erred, we must
ascertain whether the error was harmful.  Only if the answer to
the last question is affirmative may we vacate the judgment of
the district court.
B.  Application
    The case before us is a close one.  Taken alone, the defendants'
post-charge objections might well be insufficient to satisfy Rule
51.  Defendants' counsel was referring to Peymann v. Perini Corp.,
507 F.2d 1318 (1st Cir. 1974), which we discuss elsewhere in this
opinion.  However, this case presents a peculiar factual scenario.  A
perusal of the record and trial transcript reveals that, because
the district court was familiar with the defendants' arguments,
the post-charge objections submitted by defendants' counsel were
sufficient to give the district court notice of which
instructions' absence they objected to, as well as the grounds
therefor.   
    As a general matter, we have noticed that throughout the trial,
the district court handled all objections to its rulings in an
expeditious and efficient manner.  Once the court had heard an
argument, understood it, and ruled upon it, it did not want to go
over the same ground again.  The court thus requested that
counsel subsequently state their objections for the record as
concisely as possible, discouraging them from repeating at length
again the basis for their objections.
    The transcript indicates that the court was well aware of the
grounds for the defendants' objections to the lack of
instructions on comparative negligence and the primary duty rule.  
The record of this case included a copy of the defendants' first
motion for judgment as a matter of law, on the cover of which the
court had written its ruling - "Denied."  The motion was
accompanied by a memorandum of law discussing at length the
defendants' contention that the evidence heard at trial
established that Wilson had both been comparatively negligent and
been injured solely as a result of his violation of his own duty
to maintain a safe working environment.  Although it is not clear
whether the motion was entered on the case docket, we strongly
suspect that the  handwritten ruling denying the motion is the
ruling to which Mr. Clinton refers to in the following exchange:
    MR. LATTI [Plaintiff's counsel]: I'd like to move at this time
    for a judgment as a matter of law on the issue of contributory
    negligence of the plaintiff.
    THE COURT: I will not charge on contributory negligence.
    MR. LATTI: All right.  When you say you're not going to charge,
    is that an issue?
    THE COURT: It's not an issue.
    MR. LATTI: All right.
    MR. CLINTON [Defendants' counsel]: He addressed it the other day,
    and I understood the ruling. (Indicating document.)

Transcript, at 6-57 (emphasis supplied).  In any case, this
excerpt makes it evident that by the sixth day of trial, the
court had been presented with detailed arguments on the issues of
comparative negligence and the primary duty rule, and had
determined that there was insufficient evidence to justify
instructing the jury on those issues.
    A subsequent bench conference, during which the court ordered the
parties to agree upon a special verdict form, showed that all of
the participants, including the deputy clerk, knew quite well
that the court had ruled that no instruction on comparative
negligence would be given.  Wilson contends that the defendants'
failure to argue their objections forcefully and in detail
indicates that those objections had been waived.  We disagree.  
In light of the court's policy toward objections, in general, and
of its prior rulings on the issues of comparative negligence and
the primary duty rule, in particular, we read the exchange that
occurred during that bench conference as indicating only that the
defendants were following the court's instructions to hold their
objections until after the charge, when they would be restated
concisely to preserve them for appeal.
     After the parties' closing arguments, and immediately before the
court began its instructions, Mr. Clinton sought some changes to
the jury instructions.  The judge denied the request, stating:
"You listen to my instructions.  I am sure you won't like them,
but you can save your rights after I am through.  Okay?"  The
court's response corroborates our general impression: that the
district court had heard, understood, and denied the defendants'
requests for instructions, but that it properly allowed the
defendants to preserve their objections for appeal.   
    After the court instructed the jury, but before the jury retired
to deliberate, another bench conference was held, during which
the defendants' counsel stated his objections for the record.  
See supra note 5.  As we mentioned above, if this had been the
only objection made by the defendants, it probably would not have
sufficed to meet the requirements of Rule 51.  In the context of
the facts of this case, however, we deem the objection
sufficiently detailed to alert the court of its nature and
grounds.  It is evident that the court clearly understood the
gist of the defendants' arguments and had already reached a
determination upon the merits of those arguments.  The court did
not, however, wish to curtail the defendants' right to appeal its
determination, so it allowed their counsel to state their
objections for the record in abbreviated form.
    We ended our discussion of practice under Rules 49(a) and 51 by
noting that, notwithstanding how strictly they are applied, there
will exist a few, rare occasions in which we will deem objections
to have been preserved if it is shown that the district court had
actual notice of the nature and grounds of the objections.  This
case is one such occasion.  Earlier in the trial, the district
court had clearly rejected the defendants' motion for judgment as
a matter of law on the issues of comparative negligence and the
primary duty rule.  Subsequently, the court rejected their
request for instructions on those issues, and thereafter
discouraged the defendants' counsel from rehashing the objections
repeatedly, other than merely noting them for the record.  
Considering the entire interaction between the court and counsel,
we conclude that the defendants' counsel sufficiently apprised
the court of their objections and the reasons therefor to
preserve them for appeal.
C.  Failure to give instructions
    Wilson argues that even if the defendants preserved their
objections to the court's jury instructions and special verdict
form, the court's decision not to instruct on comparative
negligence and the primary duty rule was correct and therefore
harmless.  Wilson contends that the district court acted
correctly in denying the defendants' request for instructions
both because the instructions they proffered were incomplete, and
because the evidence adduced at trial was not sufficient to allow
a reasonable jury to conclude that he had either acted
negligently or violated his duties as chief mate.  We are not
persuaded by either argument.
    Courts often state in broad terms the rule that a trial court is
under no obligation to accept a request for an instruction if the
proffered instruction is incorrect in any way.  For example, we
have remarked that "the lawyer must propose a lawful instruction
or correction, and not one that substantially overstates the law
in that party's favor."  Parker v. City of Nashua, 76 F.3d 9, 12
(1st Cir. 1996) (citing Scarfo, 54 F.3d at 944).  Other circuits
hew to a similar line.  See, e.g., Robinson v. Bump, 894 F.2d
758, 761 (5th Cir. 1990) ("If an objection is raised against the
failure to grant a requested instruction, the correctness of the
proposed instruction must be shown as a threshold matter.").
    Of course, a court should not agree to give the specific
instruction requested by a party if that instruction is incorrect
as a matter of law.  However, the position advocated by Wilson is
a different one - that the trial court's decision not to give any
instructions on comparative negligence and the primary duty rule
was correct precisely because the specific instructions proposed
by the defendants were either incomplete or incorrect.   
    Wilson's argument is surely wrong.  There are two separate rules:
a) a court must instruct the jury correctly and adequately on
controlling issues, see Sullivan v. National Football League, 34
F.3d 1091, 1107 (1st Cir. 1994), and b) a court need not accept a
particular instruction if it does not accurately state the law,
see Jerlyn Yacht Sales, Inc. v. Roman Yacht Brokerage, 950 F.2d
60, 68 (1st Cir. 1991).  Consequently, even though a trial court
is under no obligation to give any particular requested
instruction, "[i]f the request directs the court's attention to a
point upon which an instruction to the jury would be helpful, the
court's error in failing to charge may not be excused by
technical defects in the request."  9A Charles A. Wright & Arthur
R. Miller, Federal Practice and Procedure  2552 at 395-97
(1995); see Ouimette v. E.F. Hutton & Co., 740 F.2d 72, 76 (1st
Cir. 1984).  Accordingly, we need not decide whether the
defendants' proffered instructions were correct as a matter of
law.  The requests sufficed to alert the district court to the
need for some instructions, even if not the specific ones urged
by the defendants, on the affirmative defenses of comparative
negligence and the primary duty rule.
D.  Harmlessness of the error
    We come, therefore, to the merits of the dispute: did the
district court err in failing to charge the jury on comparative
negligence and the primary duty rule?  As mentioned above, a
district court is duty-bound to give instructions on all issues
of material fact raised by the evidence adduced at trial.  The
standard for determining whether a factual issue is sufficiently
contested to require an instruction is identical to the standard
for determining whether a factual controversy prevents the entry
of judgment as a matter of law.  Compare Fashion House, Inc. v. K
Mart Corp., 892 F.2d 1076, 1088 (1st Cir. 1989) ("[A] mere
scintilla of evidence is not enough to forestall a directed
verdict, especially on a claim as to which the burden of proof
belongs to the objecting party."); with Farrell v. Klein Tools,
Inc., 866 F.2d 1294, 1297 (1st Cir. 1989) ("There must be more
than a scintilla of evidence to support an instruction."); cf.United States v. Rodrguez, 858 F.2d 809, 812 (1st Cir. 1988) (In
criminal cases, "the district court's task [of determining
whether an issue requires an instruction] bears a resemblance to
its function in determining whether or not a directed verdict or
judgment of acquittal should be ordered.").   
    In neither situation may the court weigh the evidence, make
credibility determinations, or resolve conflicts in the proof.  
Instead, the court must determine whether the evidence presented
at trial, along with all inferences that may reasonably be drawn
therefrom, could plausibly support a finding for either party on
any given issue of material fact.  Cf. Transamerica Premier Ins.
Co. v. Ober, 107 F.3d 925, 929 (1st Cir. 1997) (in the Rule 50
context, the court makes all reasonable inferences in favor of
the non-moving party).  "Because such a decision entails not
differential fact-finding, but merely an inquiry into the legal
sufficiency of the evidence, the standard of appellate review .
. . should be plenary."  Rodrguez, 858 F.2d at 12; see alsoAnderson, 862 F.2d at 916 (determination whether fact omitted
from special verdict form was material to the ultimate issues in
the case reviewed de novo); Connecticut Mut. Life Ins. Co. v.
Wyman, 718 F.2d 63, 65 (3d Cir. 1983) (trial court's decision not
to give instructions on a particular issue reviewed de novo); but
see United States v. Gmez-Osorio, 957 F.2d 636, 642 (9th Cir.
1992) (trial court's determination on issue whether required
factual foundation existed to warrant particular jury instruction
reviewed only for abuse of discretion).
    Wilson contends that the evidence presented at trial was
insufficient to allow a reasonable jury to find that he was
contributorily negligent or that the only cause of his injuries
was his violation of his duties as chief mate.  We disagree.  
Unlike at common law, in both Jones Act and unseaworthiness
actions, neither assumption of risk nor contributory negligence
are available as complete defenses to liability.  See Socony-
Vacuum Oil Co. v. Smith, 305 U.S. 424, 429-33 (1939).  Instead,
the admiralty doctrine of comparative negligence applies.  SeeJacob v. New York, 315 U.S. 752, 755 (1942).  This defense
requires, among other things, evidence that the seaman chose to
perform a task in a manner that placed him in danger despite the
fact that there were safer alternative means available to him.  
See Burden v. Evansville Materials, Inc., 840 F.2d 343, 346 (6th
Cir. 1988); 1 Thomas J. Schoenbaum, Admiralty and Maritime Law  
6-22 at 324 (2d ed. 1994).  A finding of "contributory
negligence, however gross, is not a bar to recovery but only
mitigates damages," see Socony-Vacuum Oil Co., 305 U.S. at 431,
reducing the plaintiff's recovery in proportion to his or her
negligence.  Thus, contributory negligence can be a complete
defense when a jury finds that the plaintiff's own negligence was
the sole proximate cause of the injuries.
    The primary duty rule provides that a ship's officer may not
recover against his employer for negligence or unseaworthiness
when there is no other cause of the officer's injuries other than
the officer's breach of his consciously assumed duty to maintain
safe conditions aboard the vessel.  See Walker v. Lykes Bros.
S.S. Co., 193 F.2d 772, 773 (2d Cir. 1952).  In Boat Dagny, Inc.v. Todd, 224 F.2d 208, 210-11 (1st Cir. 1955), this circuit
explained that the primary duty rule does not bar recovery where
the plaintiff breached his duty but the ship's owner was also
independently at fault.   "Our decision merely followed the
self-evident proposition that not every breach of duty will
assign a seaman full responsibility for his injury."  Peymann v.
Perini Corp., 507 F.2d 1318, 1323 (1st Cir. 1974).  The primary
duty rule bars recovery only if there was no cause of the
officer's injuries other than the breach of duty.  "As Judge Hand
noted in Walker, the bar is not based on the contributory
negligence of the officer, but on a finding of no negligence of
the employer."  Kelley v. Sun Transp. Co., 900 F.2d 1027, 1031
(7th Cir. 1990).   
    An instruction on comparative negligence must therefore be given
if the evidence establishes a genuine controversy as to whether
Wilson placed himself in foreseeable danger even though safer
alternatives were available, and whether his choice was the
proximate cause of his injuries.  Similarly, an instruction on
the primary duty rule must be given if the evidence establishes a
genuine controversy as to whether Wilson owed a duty to the
defendants, whether he breached the duty, and whether that breach
was the sole proximate cause of his injury.  See Peymann, 507
F.2d at 1323.  We find that the evidence in this case was
sufficient to allow a reasonable jury to find either that Wilson
was contributorily negligent or that his injuries were caused
exclusively by his own failure to perform his primary duties.
    Evidence was presented at trial indicating that Wilson had not
been ordered to patch the hydraulic lines while the OVERSEAS
BOSTON was on the high seas.  Indeed, the captain testified that
it had been Wilson who had proposed that the lines be patched.  
He stated that the day prior to Wilson's accident, Wilson had
been in tank No. 2C patching another set of hydraulic lines on
the tank's aft bulkhead, near the bottom.  While conducting those
repairs, Wilson noticed that some of the lines on the forward
bulkhead were also leaking, but at a much greater height.  He
therefore ordered that the tank be filled overnight to the 65
foot mark, so that he could patch the second set of lines the
following day.  In addition to the captain's testimony, the
defendants' expert testified that no reasonable chief mate would
have entered a tank that was filled so close to the deck when the
vessel was under way on the high seas, much less without wearing
a hard hat and life vest, because of the possibility that waves
could form in the tank as a result of the normal movement of the
ocean's surface.   
    Moreover, the plaintiff admitted that prior to this voyage, he
had never performed repairs inside a tank while the ship was on
the high seas.  He also admitted that he had the authority to
abort the operations at any point.  Finally, Wilson testified
that on the morning of January 19, 1994, when he first entered
tank No. 2C, he found the water level too high and thus ordered
it to be lowered an additional 12 to 18 inches.  It was not until
after the water level had been adjusted that he boarded the raft.
    The evidence presented at trial created a genuine issue of fact
as to whether Wilson had been contributorily negligent.  For
example, a reasonable jury could find that Wilson was acting
under his own authority when he decided to patch the hydraulic
lines, and that he was in control of the operation.  A jury could
find that Wilson should have known that entering a lightless tank
when the water level is less than 10 feet from the deck (and less
than 5 feet from the beams) and the ship is on the open sea could
put him in harm's way if the water level shifted, and that he
should have foreseen that the swells and waves on the ocean's
surface could cause the water inside the tanks to shift.  
Similarly, a jury could infer that Wilson knew that the repairs
were dangerous from his adjustment of the water level prior to
boarding the raft, and from his admission that he had never
performed this type of repair when the ship was outside of a
harbor.  A jury could also believe that the wave in the tank was
not caused by the vessel's course change, which would undermine
Wilson's claim that his injuries were causally related to the
defendants' negligence.   
    Finally, and most importantly, a jury could conclude that Wilson
was negligent because a safer course of action had been available
to him.  See Burden, 840 F.2d at 346.  A jury could find that it
was not necessary for the lines to be repaired while the ship was
at sea.  A jury could therefore find that Wilson could have
chosen to wait until the OVERSEAS BOSTON reached the port at
Valdez, Alaska, to perform the repairs on the hydraulic lines.
    This evidence, together with testimony indicating that Wilson's
duties as chief mate included responsibility for the safety and
maintenance of the ship, in general, and of the line patching
operation, in particular, also suffices to permit a jury to
conclude that the only proximate cause of Wilson's injuries was
his own failure to perform his duties as chief mate to maintain a
safe working environment.   
    Of course, we do not mean to imply that the evidence compels the
conclusion that Wilson was contributorily negligent or that he
was injured solely as a result of his violation of his duties.  
In fact, a jury could just as easily disbelieve all of the
testimony mentioned above, or draw different inferences from it.  
We merely point out that the evidence could have been believed by
a jury and could justify a finding that he had acted negligently.  
The defendants were therefore entitled to instructions on both
affirmative defenses.   
    Moreover, the district court's erroneous failure to charge the
jury on these issues was not harmless error.  See Fed. R. Civ. P.
61.  A compelling argument could be made that the failure to give
any instructions on a material issue is harmful per se, but, in
any case, the omission of these particular instructions was
clearly harmful.  The fact that the jury found for Wilson in this
case does not persuade us otherwise, because we are in grave
doubt as to whether the jury would have found that Wilson had not
been negligent at all, had the jury been instructed as it should
have been.  For example, even though the defendants provided
evidence at trial that Wilson's breach of his duty to ensure that
shipboard repairs are carried out safely was the sole cause of
his accident, the lack of an instruction on the primary duty rule
could have allowed the jury to ignore Wilson's own actions and
thereby to seek another explanation for his accident.  Similarly,
the lack of an instruction on comparative negligence permitted
the jury to find that the defendants were, in effect, 100%
comparatively negligent even though the evidence could support a
finding that Wilson was at least partially responsible for his
own injuries.
    Accordingly, a new trial is required so that a jury may properly
consider the plaintiff's actions along with the defendants' in
determining liability.  See Allen v. Chance Mfg. Co., 873 F.2d
465, 469-70 (1st Cir. 1989) (erroneous jury instruction requires
new trial if the error could have affected the result of the
jury's deliberations).
III.  Separability of issues on remand
    Wilson requests that, if the case must be remanded because of an
error in the instructions, the remand be limited to issues of
liability.  The defendants, on the other hand, contend that they
are entitled to a new trial on all issues, including damages.
    "An appellate court has broad discretion to remand for a new
trial on all, or only some, of the issues in the case."  Dopp v.
HTP Corp., 947 F.2d 506, 518 (1st Cir. 1991); see also Fed. R.
Civ. P. 59(a).  Normally, an order remanding a case for a new
trial should encompass all of the issues in the case, "unless it
clearly appears that the issue to be retried is so distinct and
separable from the others that a trial of it alone may be had
without injustice."  Gasoline Prods. Co. v. Champlin Refining
Co., 283 U.S. 494, 499-500 (1934).  The decision to remand a case
for a new trial on fewer than all of the issues thus depends not
only upon a finding that the issues are logically distinct, but
also upon considerations of equity and practicality.
    The question whether a plaintiff has suffered certain damages
does not generally depend, as a matter of law, on whether that
plaintiff is legally entitled to compensation for those damages.  
In this case, for example, the amount of future income that
Wilson may have lost as a result of his injuries is independent
of his legal claim to receive full, partial, or no compensation
for such damages.  In this regard, "comparative negligence is
regarded as a liability concept."  La Plante v. American Honda
Motor Co., 27 F.3d 731, 738 (1st Cir. 1994).  We have held that
the issues of liability, including issues of comparative
negligence, were in certain cases "so distinct and separable from
the damages issue[s] that a partial trial of the former [could]
be had without injustice."  Id.; see also Winn v. Lafayette Town
House, 839 F.2d 835, 836-37 (1st Cir. 1988); Calaf v. Fernndez,
239 F. 795, 799 (1st Cir. 1917).  In La Plante, for example, we
found particularly compelling the fact that "the trial judge
submitted detailed interrogatories to the jury, [so that] we
[knew] the jury's total damage award to the plaintiff, as well as
the amount discounted due to comparative negligence."  27 F.3d at
738.  Thus, on remand, "if the comparative negligence figures
[were] changed as a result of the new trial, the total damage
award [could] be adjusted accordingly."  Id.
    In theory, the amount awarded by a jury in the form of
compensatory damages should not be influenced by the jury's
findings as to liability.  Sometimes, however, the possibility
may arise that the jury's special verdicts on damages might have
encompassed some undisclosed compromise.  For example, a jury
could raise the amount of damages awarded if the jurors perceive
the plaintiff to be particularly deserving of their solicitude,
or the defendant particularly deserving of their opprobrium.  The
likelihood of this possibility occurring may increase when, as
here, the jury is given no instruction at all on comparative
negligence.  In such cases, it might happen that a jury could
understand the judge's decision not to instruct on comparative
negligence as an implicit indication that there was not enough
evidence of the plaintiff's contributory negligence to even
submit the question to them.  It is not unimaginable for a jury
to infer from the fact that there was no instruction on
comparative negligence that the award of damages should be
increased as an additional sanction.
    In the end, our decision as to the scope of our remand order is a
matter of judgment.  In this particular case, because of the
possibility that the jury might have been led by the lack of an
instruction on comparative negligence to increase the total award
of damages, and out of an abundance of caution, we order a
retrial of all issues in this case, including damages.
IV.  Conclusion
    Because we find that the district court's failure to instruct the
jury on comparative negligence and the primary duty rule was both
erroneous and prejudicial to the defendants' substantial rights,
we strike the verdict, vacate the judgment, and remand this case
for a new trial on all issues, including damages.  The request
for a remittitur is therefore moot.  No costs.

</body>

</html>